## HOSFORD et al. v. WAKEFIELD.

(District Court, D. Oregon. September 12, 1902.)

No. 4,602.

1. NAVIGABLE WATERS—COLLISION OF STEAMER WITH BRIDGE PIER—NEGLIGENT NAVIGATION.

A steamer with a loaded scow lashed to her side, while attempting to pass out of Lewis river during an unprecedented rise of water, when the current was the strongest known, struck upon some piling which had been put in for one of the piers of a bridge under construction, and suffered injury. The piles had been submerged by the rising water, but the officers of the boat had knowledge of their existence and location with reference to the other pier. The opening for the draw between the piers was 100 feet, while the combined length of the two vessels as fastened together was 175 feet, and the master testified that they approached the bridge at an angle of 45°, which would have made it impossible for them to pass without striking the standing pier or the piling. It was further shown that the steamer was coming down stern foremost, and was unmanageable, sometimes drifting broadside to the current. *Held*, that the failure of the bridge contractor to mark the position of the piling by buoys, or to place fenders thereat, did not render him liable for the injury sustained, which must be attributed solely to the negligence of the steamer in attempting to make the passage under the circumstances and in the manner shown.

117 F.—60

In Admiralty. Suit to recover for injury to steamer and tow, caused by striking a bridge pier in course of construction by defendant.

Coovert & Stapleton, for libelants.
Hogue & Wilbur, for respondent.

BELLINGER, District Judge. On the 22d of November last the steamer Kehani, having in tow the scow Lincoln, loaded with railroad ties, in coming out of Lewis river struck on the north draw pier, or the piling therefor, of the bridge, in course of construction by the respondent, as contractor, for the Washington & Oregon Railway Company, causing damage to such boats, for which this suit is brought. The boats are the property of libelants. The bridge is being constructed under authority of, and from plans approved by, the war department. The complaint is that Wakefield, in the construction of said pier, drove a clump of about 50 fir piles in the channel of the river, so that the tops thereof were even with the surface of the water of the river; that on November 22, 1901, the river had risen about three feet, and had submerged such piling, so that the location of the same could not be ascertained with the exercise of ordinary care by a person navigating the river; that Wakefield negligently failed to mark the point of such submerged piling with any buoy or other mark, or to protect boats navigating the river from coming in contact with said piling by placing fenders thereat, and that the accident and damage was a result of this negligence. The scow is about 350 to 450 tons burden, 130 feet long, and 34 feet wide on deck. Her draught is six feet. The Kehani is about 100 feet in length. The opening between the pivot pier and the pier causing the damage is 100 feet in the clear. The difficulty of navigating the river through this draw is increased by the fact that at the site of the bridge, or just above it, the upriver channel bends to the north about 20°. As a result of heavy rains, the river began to rise in the morning of the day of the accident, and was rising when the Kehani went up through the draw, about 9 or half past 9 o'clock. She went above the bridge about two miles to the forks of the river, where the scow was being loaded. There was a delay of an hour or an hour and a half or so, when the steamer, with the scow in tow, started down the river. When the Kehani went up the river, the water was just about over the piles in question. The captain of the steamer, on the previous trip up the river, about the 18th of the month, noticed some piling at the north pier. He "paid no attention" to this pier as he went up on the morning of the accident, but went right through. He says that he did not see it, because it was submerged, and saw nothing to indicate its location. Gerspach, one of the libelants, who was on the boat at the time, says he will not be positive whether the piles for the pier were sticking above the water when they went up the river on that morning, but thinks some were under the water already, and that there was a riffle there then. The boat had made frequent trips through the bridge, and those navigating it knew of the existence of this pier. The water rose with such rapidity that the

river had an unusual current, as swift as had ever been known. Upon starting down the river, a drag chain was put out over the bow of the scow to check the vessel's speed. The Kehani was fastened to the port side of the scow, and started down stern foremost. The combined length of the tow and tug as fastened together was about 175 feet. The captain of the tug says that when they reached the bridge they were coming at an angle of about 45°. Other witnesses testify that they were nearly, if not quite, broadway of the river. In either event, it was, of course, impossible to avoid striking either the pivot pier or the north pier. At an angle of 45°, an opening of 120 feet, at the very least, would be necessary. Preble, an engineer for the railroad, saw the boat and barge a half mile above the bridge. He testifies that the boat was coming down almost broadside, "swinging first one way and then the other," and he thinks she touched the north bank a time or two. Philip Lee, who resides on the river, saw the steamer coming down with the scow, "noticed the scow strike the bank, and the brush was cracking all along there." He says, "She just bumped." Frank S. Bedford, another witness, who lives on the bank of the river, testifies that the bow of the scow was bumping on the bank. Wright, a farmer living at Woodland, testifies that the barge's bow was raking the shore. W. J. Seaman, a workman on the bridge, testifies that: "She [the Kehani] come most everywheres you can imagine. She just come around a little ways one side, and then another side, and she was very nearly in all shapes; just like a thing would be floating on the water. The river was up very high, rising rapidly. It looked to me like the water in Lewis river had full charge of the boat and tow, and just was coming down wherever the current took her. Q. The captain didn't have much to do with it? A. I don't think he was in it. She was not quite broadside, but she was a little more than quartering when she struck." Larsen, another workman on the bridge, says, "Sometimes they were quartering, and sometimes broadside." Other witnesses testify to the same effect. The officers of the boat deny that the barge bumped the shore, or that the steamer was not under control. Capt. Fuller, at one time captain of the Kehani, testifies that it was very unusual to come down the river stern first. It is also his opinion that the chain dragging from the bow of the scow made the control of the boat more difficult "in this wise: if you want to make a turn, you can't make one short. You will slide along. The current will take effect on you, and give you a large sweep in a circle. You can't steer close." There is no doubt that the steamer and her tow were helpless in the swift current of the river on the day of the accident. That the chain dragging from the bow of the scow would make the control of the boat, under the circumstances, more difficult, and prevent close steering, as testified by Capt. Fuller, is obvious. While the chain would tend to check the drift of the boats, it also tended to keep the bow of the scow, with reference to the channel, in the position in which it was while approaching the bridge,—inshore. The bow of the scow was thus tied to the bottom of the river by this drag, and could not be swung out into the stream without overcoming the resistance which it made. So, too, of the attempt to back

downstream with such a tow in such a stream and current. Capt. Fuller says, in effect, that the boat would be unmanageable coming stern first downstream in such a current; that, in order to get steerageway, the boat must get headway, and "while you are getting this headway you have lost your control"; that "in coming down bow foremost you work backing all the time, and have constant control of your boat all the way down." It requires no experience in handling boats in swift water, and but little observation, to realize the truth of these statements. The excuse that is given for what was done is that, with the boat's stern upstream, there was danger that drift would get in the wheel. But if there was such drift in the river that the boat could not be properly handled, then the attempt to navigate it was negligence. The rise in the river was very rapid, probably six or seven feet in as many hours. The flood was a matter of a few hours only. The circumstances did not warrant the risk taken. The captain and Gerspach knew of the existence of the piling for the pier in question. They knew where the pier was located, that the water covered these piles when the boat went up the river that morning, and that the river was rising very rapidly. They knew that there were no fender piles, and they ought to have known that in backing downstream with the loaded scow there was danger of collision with one or both of these piers. On previous occasions, in moderate stages of water, the Kehani had run into the draw rest of this bridge, —according to the testimony, at least three times. At one time, shortly before this accident, she got crosswise of the current, and had to be pulled out with a pile driver. She had had other accidents at this place. If the captain of the Kehani did not sooner realize the danger of attempting to make the passage of the bridge draw, he must have done so very soon after starting down the river, when he found his boat and scow drifting downstream, at least part of the time, nearly broadway on, and some of the time quartering across. It is immaterial whether he went bumping the shore or not. He had no control of his craft. The combined length of the scow and steamer made a total length of about 175 feet. The captain himself testifies that he was half broadway, or at an angle of about 45°, when he struck the pier. In that position it was impossible to get through a clear opening of 100 feet, and that was the extent of this opening, and the captain knew it. The steamer struck the piling about opposite the fire box, about 20 feet from the bow of the steamer, and 90 or 95 feet from the bow of the scow. The captain did not choose this position. It was a matter beyond his control. There is no question about it. He was guilty of negligence in attempting to get out of the river under the circumstances. Whether, if there had been fender piles above the pier in question, he could have cushioned on them, and swung around through the draw, is not material. The absence of such piling, the existence of the pier, and the exact condition of the bridge and work were at all times known to the captain and the mate, one of the owners of the Kehani. The rule which requires a submerged obstruction to navigation to be buoyed does not apply. Such marking is to give notice. Here there was notice. The officers of the boat knew all that a buoy could have indicated.

The site of the bridge and the pivotal pier were plainly marked. The site of the next pier on the north was known by its relation to the other work, if not otherwise; and some of the piles at the lower end of the pier were still above water. So far as information of the location of the pier was necessary to enable the captain of the Kehani to keep off it, he had it. What he needed, according to the testimony of libelants' witnesses, was a fender upon which to cushion; but there was no duty imposed upon the respondent towards those navigating the river to provide this. Such piling would have been a reasonable precaution for the protection of the pier, while in course of construction, from injury from driftwood, or from such accidents as that in question. But there was nothing to indicate to the contractor that in the navigation of this part of the river boats must have a fender to bump against broadway, from which they must be swung or pulled around through the draw opening; and, if there was, it does not follow that it was the duty of the contractor to provide it. And if this was a reasonable requirement, it would not be expected, at such a stage of the work, and when the piling for the pier might be reasonably expected to perform that service, that anything further was required. Such a rise and such a current in the river appear to have been unprecedented. The river rose at the rate of at least a foot each hour. A witness who particularly noted the fact testified that it rose six inches in ten minutes. Four witnesses long acquainted with the river—one of them for 30 years—testify that the current was the swiftest known. The attempt to back down with a loaded scow under such circumstances was an act of unaccountable imprudence. It is not surprising that the scow and tug went bumping along the shore, and, missing the opening by a little less than a hundred feet, crashed nearly broadway onto the pier. The libelants were not only negligent, but recklessly so.

The libel is dismissed, without costs.