## CITY OF DETROIT v. WYANDOTTE TRANSP. CO.
### No. 6580.

Circuit Court of Appeals, Sixth Circuit.
April 12, 1935.

A. R. Jobson, of Detroit, Mich. (Raymond J. Kelly, John Atkinson, James R. Walsh, and David I. Linebaugh, all of Detroit, Mich., on the brief), for appellant.

Gilbert R. Johnson, of Cleveland, Ohio (Thomas H. Garry and Goulder, White, Garry & McCreary, all of Cleveland, Ohio, on the brief), for appellee.

Before MOORMAN, HICKS, and SIMONS, Circuit Judges.

HICKS, Circuit Judge.

This is a suit in admiralty brought by appellee, Wyandotte Transportation Company, against the city of Detroit for damages for the loss of use and expenses incurred in releasing and repairing its steamer Conneaut, which ran aground while attempting to deliver a cargo of coal to the

waterworks dock of appellant. The libel alleged that the injury was caused by an unlawful obstruction built and maintained by the city which it had failed to mark and chart.

• Appellant denied all liability and alleged that the master of the Conneaut proximately caused the injury to the vessel by negligently abandoning the regular channel of the river and undertaking to sail across a charted shoal.

The court found for appellee, and decreed a recovery in the sum of $17,873.72.

The waterworks plant of appellant lies along the north shore of the Detroit river opposite the eastern or upper portion of Belle Isle, which there separates the river into two channels. The use of the north channel is interfered with by shoal water and by a bridge which connects the mainland with Belle Isle near its western or lower end, and it is confined mainly to local traffic and small shore craft. The larger boats use the south channel.

About 1929, appellant's department of water supply constructed a new coal dock, approximately 500 feet long, which would accommodate large self-unloading steamers drawing up to 20 feet, and which could be reached from the south channel of the river via the upper end of Belle Isle. Previously its coal had been delivered on small barges which it unloaded by its own machinery. In the same year to afford access to its dock to large steamers the department let a contract for "Dredging an Access Channel to the Water Works Park Dock." The specifications called for dredging the harbor to a depth of 20 feet in front of the dock and for a distance of 500 feet above and below it, and roughly for 600 feet out into the river to the deep waters of the north channel. The contract called for the removal of two old intake pipes, but specified that a third one, to be used for reserve, and extending upstream at a slight angle, 700 feet into the river from a point near the upper end of the dock, should not be disturbed. The specifications forbade dredging within 20 feet of either side of this pipe, the entire length of which lay within the proposed harbor line or within the north channel. Readings on the map prepared by the department of water supply for the dredging showed above this pipe and its supporting strip of earth water as shallow as 10 and 12 feet near the dock, and as shallow as 15 feet at points roughly three, four, and six hundred feet out from the dock. At only one or two places along this strip, 40 feet wide and nearly 700 feet long, did the map show depths as great as 20 feet. Prior to the stranding, there were no markings showing the presence of this pipe or ridge of earth.

The permit of the War Department under which this dredging was done required, "That any material dredged in the prosecution of the work herein authorized shall be removed evenly, and no large refuse piles, ridges across the bed of the waterway, or deep holes that may have a tendency to cause injury to navigable channels or to banks of the water way shall be left" but "in accordance with the plans shown on the drawings attached hereto. * * *"

But appellant did not show what drawings were submitted to the War Department, nor that it was authorized by it to leave the ridge of earth and superincumbent pipe line.

On August 10, 1932, the Conneaut, 436 feet long, 56 feet beam, and drawing 16 feet, moving with a cargo of 5,650 tons of coal from Lorain on Lake Erie, proceeded up the Detroit river past Belle Isle and rounded its upper end at 8:40 a. m. preparatory to entering the north channel. The coal by previous agreement was to be delivered to the waterworks at the new dock.

The steamer started down the north channel, and, obeying a warning sign thereon, kept about 500 feet north of a new intake crib of the waterworks at the northeast corner of Belle Isle. Drawing abreast of the dock, the wheel was thrown hard aport and then amidships, as the engines were reversed, so that the boat began to leave the channel with its bow pointing toward the center of the dock. It was intended by this maneuver to turn the steamer around so that it would be headed upstream against the current as it docked. Although its engines were now in reverse, the Conneaut, due to the current, still had slight headway forward with its stern swinging down stream. At this point it "fetched up" near the bow on an obstruction and its forward motion was soon stopped, its stern continuing to swing slowly down stream with the current until it came to rest. The boat's position was now about 300 feet off the upper end of the dock, broadside to the stream, listing slightly to the starboard, and with its bow up about a foot. Soundings revealed a hard substance, such as steel or stone, 15

676

feet down and 30 feet from the stem on the starboard side, and another similar obstruction was located at the same depth about midships on the port side. Elsewhere the soundings disclosed 18 to 22 feet of water.

The master, Captain Yates, tried, without effect, reversing his engines and swinging from side to side the heavy boom which was a part of the unloading equipment. He then radioed for a tug which arrived at 11:30 a. m. It was unable to move the Conneaut either by pulling upstream on a stern line or on a line attached to the bow. A lighter was brought alongside about 5 p. m. and coal was unloaded by means of a boom from aft to midships. The tug, pulling downstream on a stern line, drew the ship over the obstruction after about 600 tons of coal had been removed. The Conneaut then docked about 6:15 p. m. and finished unloading by midnight.

The pipe was six feet in diameter, of three-eighths inch wrought iron, and had been in place and rusting and corroding since 1890. A diver, who five months after the grounding, examined it from where it came out inshore to within 100 feet of the outer end, found a break in the pipe 225 to 250 feet offshore. This break was 30 inches long and 15 inches across and had a "web" on it as if it had been "opened with a can opener," and was slightly torn out on the downstream side as though it had been struck from upstream. The bottom of this hole was about 14 inches from the top of the pipe and the diver testified that it could have been made by the prow of a downbound ship moving at an angle of about 33 degrees to the dock. Inshore 20 feet from that point he found a cluster of three or four pilings, one lying across the pipe, and the others against its upstream side. At 450 feet out he found a hole in the top of the pipe and another 20 feet farther out, both with the ragged edges on the upper side as if they might have been made by the propeller. But the pipe was not crushed nor flattened at any point along its length.

From the evidence thus stated it is not definitely certain that the Conneaut stranded upon the pipe. The pipe was fragile, and was not crushed as might have been expected had the boat struck it broadside. But a few facts are clear:

■ The Conneaut went aground on some hard substance in 15 feet of water. The intake pipe and earthen shelf, according to appellant's own map, used as a basis for dredging the harbor, stuck up in many places above the 20 feet dredged level. Points on this pipe and shelf, less than 16 feet deep, occurred approximately 300 and 500 feet from shore; and the preponderance of the evidence is that as the Conneaut lay stranded the intake pipe extended somewhat diagonally under her bottom. The only opposing theory is that the Conneaut struck the piles, but the piles were not anchored, they were tied together but were otherwise loose, and this theory does not account for the fact that the Conneaut "fetched up" midships where there were no pilings as well as at the prow where pilings were found.

We think the weight of the evidence is that the Conneaut stranded upon the pipe left in the river and that this was the proximate cause of her injury. That it was negligence to leave it there upon its supporting shelf, is hardly debatable. The probable consequences might have been readily foreseen. The question is, not whether it was lawfully located in 1890, but whether it was a menace to navigation when it was left in place after the harbor was dredged in 1929. Having dredged the harbor for the accommodation of larger vessels, and thus inducing them to come to its dock for its benefit, appellant was under the legal duty of using reasonable diligence to maintain the approach in a safe condition and to remove any dangerous obstructions or at least to give notice of their existence. Smith v. Burnett, 173 U. S. 430, 433, 19 S. Ct. 442, 43 L. Ed. 756; Slater Fireproof Storage Co. v. Nicholson Transit Co., 47 F.(2d) 734 (C. C. A. 7); Ætna Ins. Co. v. Davidson S. S. Co., 257 F. 68 (C. C. A. 7); Southern Bell Tel. & Teleg. Co. v. Burke, 62 F.(2d) 1015, 1017 (C. C. A. 5); Transmarine Corp. v. Fore River Coal Co., 28 F. (2d) 624, 625 (D. C.); Hartford & N. Y. Transp. Co. v. Hughes, 125 F. 981, 982 (D. C.).

■ Appellant urged that it was under no obligation to give notice of the presence of the intake pipe; that the master of the Conneaut was using a government chart (Libelant's Exhibit No. 3) which indicated that his approach to the dock was through shallow water, varying from 12 to 18 feet in depth, and that he therefore already had notice that his course was unsafe. Appellant relies upon Hosford v. Wakefield, 117 F. 945, 948 (D. C.); and Corby v. Rams-

dell, 48 F.(2d) 701 (C. C. A. 2). This contention is untenable. The District Court found as a fact, in which finding we concur, that some time before the accident Captain Yates visited the waterworks plant for the purpose of acquiring information about the approach to the dock and was advised that there was deep water in its vicinity. Captain Yates testified that he talked with Mr. Gould, the superintendent of the waterworks. He stated that: "When we looked at the dock and it appeared to me a new dock, I had looked to the chart previous to that, and I said, 'how is the water down here?' 'Oh,' he said, 'we dredged that all out.'"

Appellant knew therefore that the master would not wholly rely upon the chart.

Further, we agree with the District Judge that the master of the Conneaut was without fault. It is conceded that he had no actual notice of the presence of the pipe. Upon the representations made by Mr. Gould, he had a right to assume that the approach was clear. He knew after his conversation with Gould, that the Huron, a sister ship of the same tonnage and dimensions, also loaded with coal, had twice reached the dock without trouble or mishap. It is urged that he should have sailed farther down the river before turning, but he testified that because of the position of some yachts which were anchored lower down the river he turned sooner than he otherwise would have done. He had also been officially advised by Bulletin No. 41, issued in April, 1932, by the War Department, Corps of Engineers, that the river channel was "little used except for local and pleasure traffic * * * a very shallow middle ground outlined by spar buoys exists between the island and the main shore. * * *" This middle ground is referred to in the record as the "Scott Middle Ground" and covered a wide area in the channel about 1,000 feet below the dock. He had therefore at best a very limited range of movement for so large a ship. We find no basis for the contention that he was careless.

Finally, it is urged that all the damages allowed were not caused by the stranding of the vessel. We have examined the evidence and without extended discussion find no reason for interfering with the decree in this particular.

The decree of the District Court is affirmed.