## M & M DREDGING & CONSTRUCTION CO. v. MIAMI BRIDGE CO.
### No. 286–M.

District Court, S. D. Florida, Miami Division.

June 21, 1941.

Stanley C. Myers and McKay, Dixon & DeJarnette, all of Miami, Fla., for libelant.

Mitchell D. Price & Charles W. Zaring and Kurtz, Reed, Sappenfield & Cooper, all of Miami, Fla., for respondent.

HOLLAND, District Judge.

1. The respondent, Miami Bridge Company, a Florida corporation, owns and operates a toll causeway across the waters of Biscayne Bay, in the Southern District of Florida. This causeway consists of an earthen embankment interrupted by numerous openings across which are bridges. In the western end of the causeway there is a long series of concrete spans supporting the causeway, in the center of which is a bascule bridge, i. e., one composed of two leaves which open upward so as to permit marine traffic to pass through. This bridge was constructed under a permit of the War Department which requires an opening of

60 feet between the leaves of the bridge when fully open. The leaves of the bridge rest upon concrete abutments which are protected from contact with marine traffic by heavy piling driven into the bottom of the Bay, to which are attached heavy timbers running parallel with the surface of the water and known as "fenders." The opening between these fenders, under the terms of the permit referred to, is 59.3 feet.

2. The leaves of the bridge operate by separate electric motors, that is, one motor for each leaf of the bridge. When the leaves are lowered so as to permit the passage of land traffic over the bridge, they are held in place by certain gears and brakes. When the leaves are to be lifted, the bridge tender, who is stationed in a small house on the westerly side of the bridge and the south side thereof, releases the brake by pressing his foot on the pedal, and applies power to the electric motors by turning two control levers, which levers are connected with electrical devices which control the amount of electricity admitted to the motors. When the leaves of the bridge have been raised a few feet they disengage from each other and thereafter operate independently. When the leaves have reached a certain height, an automatic electrical device cuts off the motors and the leaves cease to move. At this point the opening between the leaves is some where between 50 and 57 feet in width. If the bridge tender desires to open the leaves to the extent of 60 feet, after they have been stopped by the automatic device just referred to, it is necessary for him to turn the control levers back to zero and again open them so as to permit the electricity to flow into the motors, thus starting the machinery into operation again. The bridge is not equipped with any automatic device indicating when the leaves of the bridge have been opened to the extent of 60 feet. When the leaves have opened their fullest extent, that is to say, when they are open so as to give an opening of 60 feet, they come in contact with a bumper. The bridge tender had received instructions not to bump the bridge as this would tend to injure the lifting machinery of the bridge. Due to the lack of an automatic indicator to show the position of the leaves of the bridge, is was necessary for the bridge tender to use his judgment as to the position of the leaves and particularly their proximity to the bumping point. These bumpers prevented the bridge from opening to a wider extent than 60 feet.

3. About 800 feet south of the bridge which is above described, there is another causeway across Biscayne Bay, owned and operated by Dade County, Florida, on which there is a bascule, or lift bridge of similar type and construction, both as to its method of operation and as to the presence of fenders.

4. About 6 o'clock in the morning of July 5, 1940, the Tug DeGarmo, in charge of Captain Pinder, which was owned and operated by the DesRocher & Watkins Towing Company, passed through the bridge on the Dade County Causeway, above referred to. He had in tow, at that time, a flotilla composed of a scow loaded with steel pipe; the diesel dredge Superior which was owned by the M & M Dredging & Construction Company, libelant, and a series of pontoons in tandem, attached to the dredge by tow lines. The dredge was being towed stern foremost, and had neither motive power nor means of steering. On her stern were two spuds which extended approximately 30 feet above the waterline, each of which was located 4 feet 6 inches inboard on the dredge. On the dredge, at the time, were Chief Engineer, Assistant Engineer and a lever man. The tug with this flotilla passed through the County Causeway without incident and in so doing scraped against the fenders of the bridge through which it passed, on the east side.

5. Immediately after passing through the bridge on the County Causeway, the Tug DeGarmo gave a proper signal for the bridge on the respondent's causeway to open, and received a signal to proceed from the respondent's bridge tender. The leaves of the respondent's bridge began to open and the tug proceeded toward the opening. The leaves of the bridge ceased to move several minutes before the Tug entered the draw. When the bridge was open to its fullest extent of 60 feet the leaves were not vertical. It was therefore difficult, if not impossible, for one approaching the bridge to determine whether it was open to its fullest extent of 60 feet, or some lesser space.

6. As the dredge entered the draw it was toward the easterly side of the opening and from 4 to 8 feet from the fenders on the east side. However, the easterly spud struck the easterly leaf of the bridge and damaged the spud and the "A" frame which supported the spud, necessitating repairs to the amount of $711.80.

7. The bridge tender testified that at the time the spud struck the leaf of the bridge, the bridge was open to its fullest extent, i. e., 60 feet, but the Chief Engineer on the dredge, who was standing immediately beside the spud when it struck the bridge, the Assistant Engineer on the dredge, and the Captain of the tug boat, all testified that after the collision the leaves of the bridge opened still further. The bridge tender testified that the dredge was listing to the east, but this was denied by the Chief and the Assistant Engineers on the dredge, and by the tug Captain. Moreover, the libelant introduced in evidence a movable scale drawing of the dredge, the spud and the bridge fenders, which showed that if the leaves of the bridge were open to the extent of 60 feet, and if the dredge had been scraping against the fenders, which most of the witnesses denied, the listing would have had to be at such an angle that the easterly side of the deck of the dredge would have been more than one foot under water. I, therefore, find that whether or not there was any listing at all, the dredge could not have been listing to such an extent as to strike the bridge, if the bridge had been open to the extent of 60 feet as required by Government permit under which it was constructed.

8. After the collision, the tug boat Captain cut off the power and the flotilla completed its passage without further contact with the bridge.

### Discussion

The respondent contends that the Towing Company, the DesRocher & Watkins Towing Company (if there be liability on the part of any one to the libelant), is responsible. Respondent insists that the libelant was not free from blame, but that if there was liability, the negligence of the Towing Company was the proximate cause of the damage suffered by the libelant under the last clear chance doctrine. The Towing Company is not a party to this suit. The libelant did not choose to sue the Towing Company, but sued the Bridge Company alone. The Bridge Company might have impleaded the Towing Company prior to the introduction of proof, but this was not done. Application to bring the Towing Company in as a third party under the admiralty practice was sought, but this application was made after the proof had been largely developed. In fact the libelant had closed its case. Liability of the Towing Company as sought to be established by the

Bridge Company will have to be litigated, if at all, in a subsequent action, in which the Bridge Company would seek to recover of the Towing Company. In this case I am not called upon to discuss any alleged liability of the Towing Company, which is not a party to the suit, and allegations of negligence against the Towing Company should not be adjudicated here, with it not being a party to defend as against such asserted liability. A very interesting case, applicable to this situation, is that of White Oak Company v. Boston Canal Company, 258 U.S. 341, 42 S.Ct. 338, 66 L.Ed. 649. There the owner of the cargo proceeded only against the Canal Company. The Owner of the vessel was the White Oak Transportation Company, and with the Transportation Company, the owner of the vessel, and the Canal Company both as parties to the action, the joint liability of the Canal Company and the Transportation Company was discussed, but as the owner of the cargo had sued only the Canal Company, no decree was considered as against the Transportation Company. In that case the principle is recognized that, even though the liability of two wrongdoers is established in an admiralty action, and apportionment of damages held equitable as between the two wrongdoers, yet the libelant, the owner of the cargo, was entitled to recover for the full amount as against the wrongdoer against which the libelant had elected to solely proceed. In the instant case, I am of the opinion that there was actionable negligence on the part of the Bridge Company, the respondent. It is improper in this case, therefore, to discuss any possible liability of the Towing Company, with the Towing Company not a party to the action. But even if there was a joint liability on the part of the Bridge Company and the Towing Company, and should there be a just apportionment of the damages between the Bridge Company and the Towing Company, yet under the principle of law stated by the cited case, the libelant is entitled to recover full damages against the wrongdoer which it has elected to sue.

An important consideration in this case is the fact that the dredge had no motive power, and no steering devices. The motive power in this tow was that furnished by the Towing Company. It may have been that there was some motive power in connection with the pontoons, but this was at the rear of the tow, and was not the motive power giving force and guidance to the

proceeding of the tow through and under the Venetian Causeway Bridge. The libelant was entitled to look to the Towing Company for safe carriage of the dredge under this bridge, and the libelant was entitled to the performance on the part of the Bridge Company, the respondent, of its full duty in the lifting of the leaves of the bridge. If the Towing Company were a party to this action, joint liability might be established, but this I do not decide. But on the record here I do decide there was liability of the Bridge Company, the respondent, to the libelant, and under the law the libelant's full damages should be awarded as against the respondent.

The question of the amount of damages has given me some concern. I find that the libelant is entitled to the reasonable value of the repairs in the amount of $711.80. The libelant has a policy of marine insurance with the Westchester Fire Insurance Company, which policy contained a $200 deductible clause. The Westchester Fire Insurance Company has paid to the M & M Dredging & Construction Company the amount of the repairs, less the deductible amount, to-wit, $511.80, and has had assigned to it by the libelant the recovery to that amount. Westchester Fire Insurance Company is joined as a party to this suit to that extent. So far as the reasonable value of repairs in the amount of $711.80 is concerned, the Westchester Fire Insurance Company is entitled to receive, by virtue of its insurance policy and the payment thereunder, and the assignment by the libelant, the sum of $511.80. As to the remaining amount of said repair bill, to-wit, the sum of $200, the libelant is entitled to recover.

The libelant claims damages for detention at $500 per day for nine days. I find that the libelant is entitled to recover the loss of net profits for said nine days at the rate of $200 per day, less 50% thereof because of certain considerations, and, therefore, the damages allowed for detention will be the sum of $900. The considerations which I have in mind for reducing the damages to $900 are these. Proof shows that the libelant's dredge was in active demand, but there is no proof that for these nine days the libelant was forced, in carrying on its contract or work, to hire another dredge. Damages claimed are not for moneys paid out by the libelant to secure the service of another dredge, brought about by the wrongdoing of the respondent. The details of expense of operation of the dredge are not shown by the record. Under the circumstances, and the record in this case, I am satisfied that the allowance for damages for detention of the dredge during its repair would be fairly allowed in the sum of $900.

### Conclusions of Law

1. It was the duty of the respondent's bridge tender, after receiving the signal from the tug, and with knowledge of the fact that the spud was extending 30 feet into the air above the waterline, to open the leaves of the bridge to their fullest extent and to afford the tug and its flotilla the full width of the navigable waterway.

2. The respondent was guilty of negligence in the operation of its drawbridge, which caused the damage to the dredge.

3. The libelant, M & M Dredging & Construction Company, is entitled to recover of and from the respondent, Miami Bridge Company, the sum of $711.80 for repairs, and the sum of $900 for detention, and of this amount Westchester Fire Insurance Company is entitled to receive, by virtue of its insurance policy and the payment thereunder, and the assignment by the libelant, the sum of $511.80. The total recovery of $1,611.80 bears interest at the rate of 6% per annum from July 14, 1940, until paid.

4. That a decree be prepared in conformity with these findings, and presented for signing, on notice to all counsel.