## DEPARTMENT OF HIGHWAYS v. McWILLIAMS DREDGING CO. et al.

### Civ. A. No. 2218.

United States District Court
W. D. Louisiana, Lake Charles Division.

Sept. 1, 1949.

See, also, D.C., 83 F.Supp. 132.

Arthur B. Hammond, D. Ross Banister and Joseph A. Loret, Baton Rouge, La., for plaintiff.

Deutsch, Kerrigan & Stiles, New Orleans, La., for defendants.

DAWKINS, Chief Judge.

This is an action for damages to a bridge across the Calcasieu River between Lake Charles and Westlake, Louisiana. The complaint alleges that the negligent operation of the tug, dredge, etc., in a tow passing through the draw, caused the upper structure of the dredge to come in contact with one of the vascule leaves of the bridge, damaging it to the extent of $12,581.75, for which judgment is sought.

The defense is a denial of negligence, the charge that the bridge was illegally constructed and therefore an obstruction to navigation, and that the proximate cause of the damage was the negligent failure of the plaintiff to open the bridge sufficiently and properly to permit the tow to pass through, plus the presence of illegal and unauthorized pontoons or fenders, placed inside the piers between which vessels had to pass.

The tow itself was not injured, the amount of damage to the bridge has been stipulated and the only issue is as to whose fault caused the collision.

The facts are as follows:

About 6:30 P.M. on December 11, 1946, the tow, having been made up some four miles east of the bridge (which spans north-south the Calcasieu River running east-west near the southwest corner of the city of Lake Charles), signalled its desire to pass from a distance of some 1500 feet. Shortly thereafter, the bridge began to open, as could be seen by those in charge of the tow, notwithstanding darkness had descended at that hour on December 11th, because of lights on the sides and at the ends of the two leaves or spans. When within approximately 100 feet of the bridge, seeing it had not opened to a point where it was believed the vessels could pass, persons on the tug or dredge, or perhaps both, began calling to the bridge tender to open it further. Efforts were made by him to that end but the leaves were raised very little, if any, from their first position. In passing through, the starboard side of the bow of the tug came in contact with the outer of two pontoons placed side by side, having a total depth of 14 feet into the channel from the inside of the north pier. On the south side there was one such pontoon, approximately 7 feet wide. When he struck the outer pontoon on the north side, the pilot turned the wheel sharply to port, and in straightening up, the movements caused the rear end of the dredge, last vessel in the tow, to swing south to port and it came in contact with the south leaf or vascule of the bridge.

The distance between the piers, as actually constructed, was 100 feet. This, of course, was reduced some 14 feet by the two fenders or pontoons on the north, and an additional 7 feet by the one on the south or a total of 21 feet, thus leaving a clear passageway of only 79 feet. The tug was 73 feet 8 inches long and 22 feet wide, driven by an engine of 700 horse power, and was attached to the cutter head of the dredge by a single hauser, some 5 feet in length. The dredge was 168 feet long, 45 feet wide, and carried a ladder extending forward an additional 70 feet, to which must be added the cutter head, 5 feet in length or a total of 245 feet, for the dredge, ladder and cutter head. This, added to the tug, and its 5 feet of rope, made a total of 366 feet over all. Thus, if the dredge (45 feet wide) had been steered through the exact center of this reduced channel (79 feet), there would have remained about 17 feet only of clearance on either side, with a distance not exceeding 24 feet from the south pier to the port edge of the main deck of the dredge. Of course, with the port side of the dredge in contact with the fender or pontoon on that side, this distance would be reduced to approximately 7 feet from the north wall of the south pier, or a vertical line projected above it. The port side of the spud frame on the rear end of the dredge was 10 feet 7½ inches from the outer edge of the main deck, while at the point of contact with the bridge, some 58 feet above the water's surface, the spud frame was two feet 3 inches further inside such vertical line, or some 20 feet and ½ inch, including the pontoon, from the vascule leaf had it been in a vertical position, even if the deck of the dredge was in contact with the pontoon below. The frame

struck the span 4 feet from its outer edge and this indicates rather clearly that the latter extended more than 20 feet outwardly over the channel from the north side of the south pier.

According to plaintiff's engineer, the leaves could be raised a maximum of 70 degrees from the horizontal, and in this position they would protrude about 9 feet over the channel, thereby reducing the space between the upper ends of the leaves when fully opened to 82 feet. He conceded that if they had been fully opened to 70 degrees, with the 7 foot fender or pontoon in place, and if the spud frame on the port side stood back 12 feet from the edge of the deck, it would have been impossible for the collision to have occurred, as it did, had the bridge opened to the maximum of 70 degrees.

From calculations based upon the above figures, which can not be seriously disputed, the conclusion seems inevitable that the collision was caused by failure to open the bridge to its possible maximum of 70 degrees, and the weight of the evidence supports the belief that it did not exceed 50 degrees. In so far as the alleged illegal construction of the bridge is concerned, this was not the proximate cause of the collision but affects the burden of proof only. The pontoons had been there for a considerable time before the accident, and this was known to those in charge of the tow, who had passed through the draw on other occasions and were bound to have seen them. As a matter of fact, the one on the south side kept the dredge from swinging closer to pier. The matter reduces itself to the simple question of whether there was negligence on the part of plaintiff in (1) maintaining the bridge in defective condition, even within the maximum range of the vascule leaves of 70 degrees, and (2) its manipulation at the time of the collision. Plaintiff attempts to place responsibility upon those in charge of the tow, on the theory

that having negligently steered into the pontoons on the starboard or north side of the channel, the pilot of the tug was further negligent in turning on excessive power, and sharply cutting to port when straightening up and that this caused the rear end of the dredge to whip to port against the pontoon on that side in a manner that turned its stern at an angle which brought the spud frame much closer to the structure of the bridge, than the 20 feet consisting of the width of the pontoon and location of the frame on the deck of the dredge. Considering the width of this channel, 79 feet, the length of the dredge, the ladder, and cutter head of 245 feet, with the hauser attached supposedly in the center of the stern of the tug, some 25 feet therefrom, which tug itself had a width of 25 feet, while presumably the cutter head was in the approximate center of the over all width of the dredge, it does not appear that there could have been a sufficient turning of the stern to bring the spud frame appreciably closer to the overhanging leaf on the south side of the draw. The construction of the dredge was also of such a nature that there was little possibility of its rocking like an ordinary vessel, to bring the upper portion of the spud frame closer to the vascule leaf.

My conclusion is that the real cause of the accident and consequent damage to the bridge was the failure of plaintiff to open the draw sufficiently to permit passage of the tow.

As to the contention that the defendant was guilty of negligence in attempting to take this type of tow through the bridge at night, it is sufficient to say that the latter was designed for operating twenty-four hours a day, and there appears no reason to assume that the passage would not have been without incident but for the fault of plaintiff in not opening the bridge to its maximum. There should be judgment for the defendant.

Proper decree should be presented.