283 F.2d 811
 CIRCLE LINE SIGHTSEEING YACHTS, INC., Libelant-Appellee,
v.
CITY OF NEW YORK, Respondent-Appellant.
Barbara A. SMITH, as Administratrix of the Estate of
Valentine A. Smith, deceased, Libelant-Appellee,
v.
CITY OF NEW YORK, Respondent-Appellant.
 Petition of CIRCLE LINE SIGHTSEEING YACHTS, INC., as Owner
of the motor vessel
SIGHTSEER VIII, in a cause of exoneration from and
limitation of liability for
damages arising out of a collision in the Harlem River on
September 6, 1956, between
said vessel and the Madison Avenue Bridge.
 Nos. 63-65, Dockets 26126-26128.
 
 United States Court of Appeals Second Circuit.
 Argued Oct. 14, 1960.
Decided Nov. 9, 1960.
 Beatrice Shainswit, New York City (Charles H. Tenney, Corporation Counsel, City of New York, and Seymour B. Quel, New York City, on the brief), for respondent-appellant.
 William A. Wilson, of Pyne, Smith & Wilson, New York City (Warner Pyne and Albert Robin, of Pyne, Smith & Wilson, New York, City, on the brief), for libelants-appellees Circle Line Sightseeing Yachts, Inc., and Barbara A. Smith, Administratrix.
 Before CLARK, MAGRUDER, and FRIENDLY, Circuit Judges.
 CLARK, Circuit Judge.
 
 
 1
 Libelant Circle Line Sightseeing Yachts, Inc., owner of the sightseeing vessel Sightseer VIII, sued respondent City of New York in admiralty for damages resulting from a collision on September 6, 1956, between the vessel and the City's Madison Avenue Bridge, located at 138th Street across the Harlem River. Circle Line has also brought a limitation proceeding, in which claims were filed by a large number of passengers, and by the City for damage to the bridge. A third libel for personal injuries was originally filed against the City by Captain Smith, master of the vessel, and upon his death in 1958 has been prosecuted with an added death damage claim by his administratrix, Barbara A. Smith. The libels were consolidated for trial before Judge Dimock, who held the City solely liable for all damages and granted the Circle Line's petition for exoneration from liability. He then referred the claims in all three cases to a Special Commissioner for the ascertainment of damages due from the City. From the three resulting interlocutory decress the City appeals.
 
 
 2
 The Madison Avenue Bridge is a drawbridge containing a center span supported on a pivot. The center span can rotate to a position perpendicular to the position of the closed bridge, and thereby open up two lanes of traffic on the river, one on each side of the center pivot. On the afternoon of September 6, 1956, the Sightseer VIII with its passengers had left its pier in North River for its circle tour around Manhattan Island and was proceeding north on the Harlem River toward the Madison Avenue Bridge, when its captain observed a tug and tow waiting the opposite side of the bridge for it to open. The tug had signaled for an opening, and the bridge was in the process of being cleared for traffic. Despite the obvious preparation for opening, the Sightseer VIII, which was less than two minutes from the bridge at its then speed of 4.7 knots (including current), determined to go under the bridge. So long as the bridge was closed, the low-built Sightseer VIII was capable of passing under it without damage. But the bridge contained low-hanging projections which could collide with the boat if the bridge were to open while the boat were attempting to pass under it.
 
 
 3
 The bridge operator, having casually noticed the Sightseer VIII coming toward the bridge, determined to open the bridge anyway, on the assumption that the captain of the vessel could be trusted to take care of himself. By the time the captain saw the bridge opening and set the engines in reverse, it was too late to stop and the vessel collided with the half-open bridge.
 
 
 4
 The underlying cause of the collision was the City's failure to devise an effective means of warning approaching ships of the prospective opening of the bridge. The City's bridge engineer, who testified as an expert witness, stated that the underhanging projections from the opened draw could damage those boats which were low enough to pass under the closed bridge without danger. Thus the City had, or should have had, notice of the danger. When asked whether the City had developed any signal system to protect such boats the engineer testified that the bridge operator would delay the opening until the boat had passed, that he had seen this done many times, and that he had no doubt that this was the practice. Thus, instead of developing an adequate signal system to warn approaching boats, the City depended upon the bridge operator to watch for such boats and to delay opening the bridge if they were too close. The operator here failed to make any effort to protect the Sightseer VIII, and this negligence was a proximate cause of the collision.
 
 
 5
 The failure to provide an adequate signal system was similarly negligence and a proximate cause of the collision. That Army regulations relating to the bridge do not require any warning system, other than an exchange of whistle signals with the boat seeking to pass, does not excuse the City's conduct. In Oregon-Washington, Bridge Co. v. The Lew Russell, Sr., 9 Cir., 196 F.2d 707, the Ninth Circuit held that an additional signal light should have been installed to warn ships of danger in cases where the regular light went dead, and that compliance with Army regulations (which did not require an auxiliary signal) did not dispose of the duty to use due care.
 
 
 6
 The City argues that the captain of the Sightseer VIII, in continuing his progress at 4.7 knots despite the obvious preparations for the opening of the bridge, must at least be deemed contributorily negligent. Under most circumstances this would be so, since the captain would have no right to expect the bridge to wait for him to pass. Cf. 33 CFR 203.160(e); 33 U.S.C. 494, 499; The Majestic, 4 Cir., 80 F.2d 879; Griffin, Collision 263 (1949). But in view of the established practice in this case for bridge operators to wait to let approaching ships pass, the Sightseer captain was justified in assuming that the opening of the bridge would be delayed.
 
 
 7
 The City asserts that the accident was proximately caused by the Sightseer VIII's violation of the Narrow Channel Rule, 33 U.S.C. 210, which provides: 'In narrow channels every steam vessel shall, when it is safe and practicable, keep to * * * the starboard side * * *.' The Sightseer VIII approached the Madison Avenue Bridge after passing through the Bronx draw of a railroad bridge about 900 feet to the south, the Manhattan draw of that bridge being closed for construction purposes. The tug and tow which was awaiting the opening of the Madison Avenue Bridge was on its opposite or north side. The tug and the Sightseer VIII then exchanged signals for a starboard to starboard passing, in which both vessels would veer to their portside. The Sightseer VIII thus prepared to go under the Manhattan side of the Madison Avenue Bridge, and was struck as the center span swung out in a counterclockwise direction toward the vessel. Had the Sightseer VII kept to starboard and taken the Bronx draw, the bridge would have been swinging away from the vessel and the accident would probably have been avoided.
 
 
 8
 The court below, however, found no violation of the Narrow Channel Rule, because a custom had arisen, in view of the set of the tide and the closing of the Manhattan draw of the railroad bridge, for upgoing vessels to turn to the portside of the river. There was testimony that the obstruction in the middle of the river under the railroad bridge, which obstruction has since been removed, adversely affected the tides. Furthermore, the closing of the Manhattan draw made it necessary for southbound ships to move to their portside or the Bronx side of the river before passing under the railroad bridge. While custom alone does not justify departure from the important Narrow Channel Rule, these peculiar and quite temporary circumstances support a finding that adherence to the rule here was not 'safe and practicable.' In any event, whatever the conclusion as to Captain Smith's action in turning to the left, the bridge operator had no right to fail to observe the course of the vessels; and he should have been aware of their change of course.
 
 
 9
 On another ground, however, the libelant also must be held negligent. namely, the failure to maintain a lookout. 'Steamers navigating in the thoroughfares of commerce must have constant and vigilant lookouts' who have no other duties. Chamberlain v. Ward, 21 How. 548, 570, 62 U.S. 548, 570, 16 L.Ed. 211; Griffin, Collision 102, 103 (1949). The person in control of navigation cannot not fulfill this function, because his work in managing the ship prevents his giving undivided attention to possible obstructions or dangers. Chamberlain v. Ward, supra, 21 How. 548, 62 U.S. 548, 16 L.Ed. 211; Griffin, Collision 109 (1949). In the present case the captain was the only person acting as a lookout, and he was engaged in navigating the vessel. Mate Gray, who was in the pilothouse with the captain, admitted he was not looking. The failure to maintain a proper lookout was negligence. See 33 U.S.C. 221.
 
 
 10
 Under the rule of The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148, failure to maintain a proper lookout placed upon the negligent party the burden of showing that such failure did not cause and could not have caused the accident. Merritt-Chapman & Scott Corp. v. Cornell S.S. Co., 2 Cir.,265 F.2d 537, 539. The testimony of the Sightseer captain that he started to reverse as soon as he saw the bridge opening is not sufficient to sustain this burden. In view of the fact that the ship had almost stopped by the time it hit the bridge, it is quite possible that a lookout with no other duties could have seen the opening bridge earlier and either avoided the accident or at least diminished its severity. Libelant argues that it is difficult to see the bridge opening, but this seems to increase rather than decrease the importance of an independent lookout. The Dexter, 23 Wall. 69, 90 U.S. 69, 23 L.Ed. 84, and The Farragut, 10 Wall. 334, 77 U.S. 334, 19 L.Ed. 946, cited by libelant to support its contention that a lookout would not have helped, presented a situation where the obstruction was seen in sufficient time to avert the danger through skillful navigation, so that the lack of good navigation was the proximate cause of the accident. Here the danger was not seen in time to avert the collision through skillful navigation.
 
 
 11
 We find, therefore, that the collision was caused by mutual fault, and that the decree below should be modified for division of damages. The damages sustained by the two negligent parties should be totaled, and the party suffering the lesser damage will then be liable-- subject to possible limitation of liability, as referred to below-- for an amount necessary to equalize the damages suffered by the two. The North Star, 106 U.S. 17, 1 S.Ct. 41, 27 L.Ed. 91; Gilmore & Black, The Law of Admiralty 402 (1957). Liabilities to third parties, even though they may have claimed against only one tortfeasor, are customarily includible in damages sustained for purposes of the above computation. The Albert Dumois, 177 U.S. 240, 255-260, 20 S.Ct. 595, 44 L.Ed. 751; Gilmore & Black, The Law of Admiralty 438 (1957). It will be the function of the court below on remand and after appropriate hearing to instruct its special commissioner as to the disposition of claims by or on behalf of passengers or to provide otherwise for their disposition.
 
 
 12
 With respect to the issue of limitation of the shipowner's liability, the court below found that the accident occurred without managerial fault upon the part of the shipowner; and hence it was entitled, if not to exoneration, at least to limitation of liability. But this finding was made at a time when the accident was believed to have occurred without any fault whatsoever upon the part of the Sightseer VIII. In view of our finding that the Sightseer VIII was negligent in failing to maintain a proper lookout, we think it only just that the court now review its finding of lack of managerial fault after such further hearing as it shall deem appropriate.
 
 
 13
 Interlocutory decree modified to provide for division of damages; action remanded for further proceedings in accordance with this opinion.