N. M. PATERSON & SONS, LIMITED, a corporation, Libelant-Appellant,

v.

CITY OF CHICAGO, a municipal corporation, Respondent-Appellee,

v.

The GREAT LAKES TOWING COMPANY, Inc., a corporation, owner of the TUG OREGON, Impleaded Respondent-Appellee.

N. M. PATERSON & SONS, LIMITED, a corporation, Libelant-Cross-Appellee,

v.

CITY OF CHICAGO, a municipal corporation, Respondent-Cross-Appellant,

v.

The GREAT LAKES TOWING COMPANY, Inc., a corporation, owner of the TUG OREGON, Impleaded Respondent-Appellee.

Nos. 14069, 14071.

United States Court of Appeals
Seventh Circuit.

Oct. 30, 1963.

See also D. C., 184 F.Supp. 922.

Stuart B. Bradley, Chicago, Ill., Bradley, Pipin, Vetter & Eaton, Chicago, Ill., of counsel, for N. M. Paterson & Sons, Ltd.

John C. Melaniphy, Corp Counsel, Sydney R. Drebin, Harry H. Pollack, Asst. Corp. Counsel, Robert G. Mackey, Asst. Corp. Counsel, of counsel, for City of Chicago.

Harney B. Stover, Harney B. Stover, Jr., Milwaukee, Wis., and Eugene Dooner, Chicago Ill., Murphy & Pearson, Chicago, Ill., of counsel, for Great Lakes Towing Co.

Before HASTINGS, Chief Judge, and KNOCH and CASTLE, Circuit Judges.

CASTLE, Circuit Judge.

This admiralty action was brought in the District Court by N. M. Paterson & Sons, Ltd., libelant, the owner and operator of the steamer Torondoc, against the City of Chicago for damage to the Torondoc alleged to have been caused by the negligent operation of the Dearborn Street bascule bridge which spans the Chicago River. The City answered and filed a cross-libel against N. M. Paterson & Sons, Ltd., and an impleading petition and impleading libel against The Great Lakes Towing Company, Inc., owner of the tug Oregon, for damage to the bridge. The cause was tried to the court. On the basis of the findings of fact it made and entered the District Court concluded that negligence of both the Torondoc and the City were proximate causes of the collision between the steamer and the bridge, the negligence of the Torondoc contributing to the extent of two-thirds of total fault, that of the City to one-third; and that there was no fault in the navigation or operation of the tug Oregon contributing to the collision.[1] It is stipulated that the damage sustained by the Torondoc was $15,336.00 and the damage to the bridge was $9,000.00. The court concluded that the doctrine of comparative negligence applied, apportioned recovery based upon the degree of fault of each party—which, under the formula applied, entitled the city to receive $888.-00—and entered judgment limiting execution on the damages awarded the City to $888.00.

Both libelant and the City appealed. Each asserts the District Court erred in denying it recovery of the full amount of damage it sustained as a result of the collision. The libelant in its appeal (No. 14069) contends the District Court erred in finding the Torondoc at fault and, in any event, it was error to apportion damages on the theory of comparative negligence. The City in its appeal (No. 14071) contends the court erred in not finding and concluding that the proximate cause of the collision was the negligence of the tug Oregon, or the joint negligence of the Oregon and the Torondoc.

The record establishes that the Torondoc, with the tug Oregon on a line at her bow for the purpose of assisting the steamer to keep her bow in the middle of the river and in negotiating turns, was out bound on the Chicago River about 1:00 A.M. on November 20, 1957. She had started from a Halsted Street dock at midnight. The Torondoc measured 254 feet in length, there was 15 feet of water between the vessels and the tug was 85 feet long—a combined flotilla length of 354 feet. The craft passed through four bascule type bridges at Franklin-Orleans Street, Wells Street, La Salle Street and Clark Street, each of which opened serially as the Torondoc approached. The distance from the Clark Street bridge to the Dearborn Street bridge is approximately 340 feet (400 feet from center to center). The bridge tender who operated the south leaf of the Dearborn Street bridge had been notified by a telephone call from the Clark Street bridge to expect an out-bound vessel. He

---

1. The cross-libel against The Great Lakes Towing Company, Inc., was ordered dismissed on its merits.

received this notice before the Torondoc had rounded the bend at Orleans Street some five blocks to the west, within which distance approaching vessels can be seen from the bridge tender's post, whether the intervening bridges are in an open or closed position. The bridge tender relayed the call to the State Street bridge, the bridge to the east of the Dearborn Street bridge. The Torondoc was not yet in sight and the bridge tender went back to reading a book. It normally requires about 30 seconds from the time the gates are lowered to prevent traffic from entering upon the bridge for the mechanism to fully raise the leaves of the bridge. He ordinarily started the procedure to raise his bridge when the approaching ship is clearing the La Salle Street bridge—the second bridge to the west. After he received the call, the bridge tender first saw the Torondoc when its bow was passing through the Clark Street bridge—the bridge immediately to the west. He then signalled his partner, the operator of the north leaf of the bridge, who gave an answering signal to start the procedure for raising the bridge. The bells and flashing lights were put on to warn street traffic approaching the bridge. It was necessary to wait for a street car which had entered the bridge to clear the bridge before lowering the gates to stop other traffic from entering. When the bridge tender started to raise the south leaf the Torondoc was halfway between Clark and Dearborn. The south leaf rose approximately eight feet but by reason of a malfunction lowered about four feet. The malfunction was caused by a defective resistor-grid which grounded or short-circuited and opened the circuit breaker each time the power was increased to the third of the six stages available. The north leaf rose about two-thirds upward toward the open position but was then intentionally lowered to a

position about ten feet above the partly opened south leaf. It was the policy of the City, upon failure of one leaf of a double-leaf bridge to open, to withhold raising the other leaf to prevent ships from attempting to navigate through a partly open bridge.

As the tug and the Torondoc passed through the Clark Street bridge the street traffic stop-lights on the Dearborn bridge were flashing. No warning signal was ever given that the bridge would not be raised. When it became apparent that the south leaf would not rise the Torondoc put her engines full speed astern in an attempt to reduce her forward motion and the tug steered the bow of the Torondoc to the left to pass under the north leaf of the bridge. The Torondoc was unable to completely take off its way. The bow deck of the Torondoc passed under the north leaf of the bridge, but the pilot house which extends upward from the deck struck the partly-raised north leaf and the deck on the starboard struck the outer end of the south leaf.

The District Court's conclusion that contributory fault of the Torondoc was a proximate cause of the collision is predicated upon its findings that the steamer was negligent in travelling at a speed in excess of the four miles per hour maximum permissible for vessels of its type under the Chicago Municipal Code, in failing to sound its whistle upon approaching each of the bridges west of the Dearborn bridge, and in entrusting command to an inexperienced master.

The conclusion of fault and proximate causation on the City's part is based on findings that it was negligent in failing to open the bridge, in failing to adequately inspect and test, or replace, old components of the electrical mechanism which operated the bridge, and in failing to give the prescribed warning signal[2] that the bridge would not be opened.

2. A regulation of the Secretary of the Army promulgated under 33 U.S.C.A. § 499, applicable to navigation through the Chicago River bridges, provides: "(c) (2) If from any cause the bridge tender cannot open the bridge, he shall immediately notify the vessel by waiving a red flag by day and a red lantern by night and continue waving the same until the vessel has stopped, continuing to display the same until the bridge can be opened."

■ The District Court's application of the comparative negligence doctrine is based largely on its misconception that the decisions declaratory of the admiralty rule of equal division of damages in mutual fault collisions use the term "mutual fault" in the sense of "equal fault" and so restrict its application. That such is not the case is demonstrated by the observations made almost a century ago in The Atlas, 3 Otto 302, 313–314, 93 U.S. 302, 313–314, 23 L.Ed. 863.

> "Under the second of the foregoing rules,—when both vessels are in fault,—the sums representing the damages are added together, and the amount is equally divided between the parties; and that rule prevails in all cases where there is mutual fault, *even though one of the vessels may have been much more in fault than the other*. Fault being imputed to both vessels, and the charge being proved, the inquiry which was most to blame is immaterial, as the damages must be divided between the two, according to the rule provided in the admiralty courts. Vaux v. Sheffer, 8 Moore, P.C.C. 87.

> "Attempt was made in the Court of Sessions in Scotland to establish an exception to that rule; and the court finding, in a case where both vessels were in fault, that *the greater share of the blame rested on one, decided that her owners were liable for two-thirds of the damage*. Maude & P. on Ship. (3d ed.) 470; Le Neve v. Shipping Co., 1 Shaw's Cas. 378.

> "Prompt appeal was taken from that decree to the House of Lords, where the decree was reversed, upon the ground that the true rule was the one laid down by Lord Stowell, that, where a misfortune of the kind happens from the want of due diligence or skill on both sides, the loss must be apportioned between them, as having been occasioned by the fault of both. Hay v. Le Neve, 2 Shaw's H. of L. Cas. 400; The Washington, 5 Jur. 1067.

> \*   \*   \*   \*   \*   \*

> "Strict justice would require, said Dr. Lushington, that the burden of making good the loss should fall upon the two delinquents in proportion to their delinquency, but in practice the proportion is impossible to be ascertained. Such a rule, if adopted, would be utterly impracticable, for the reason that the court cannot apportion the loss according to the quantum of neglect or culpability on the one side and the other; hence equal apportionment is the universal rule where there is mutual fault, *even though the fault on one side may be much greater than the fault on the other*. The Milan, Lush. Adm. 401; The Linda, 4 Jur. N.S. 147." (Emphasis supplied.)

The District Court points also to the criticisms of the equal-division rule found in the dissent of Judge Learned Hand in Ulster Oil Transport Corp. v. The Matton No. 20, 2 Cir., 210 F.2d 106, 110, and later repeated in Ahlgren v. Red Star Towing & Transp. Co., 2 Cir., 214 F.2d 618, 620–621, and In re Adams' Petition, 2 Cir., 237 F.2d 884, 887. See also: The Margaret, 3 Cir., 30 F.2d 923, 928. But despite criticism of the rule it was applied in all of those cases. In Adams' it was pointed out (237 F.2d p. 887):

> "But the rule of equal division of property damage is so well established in this country that it would create intolerable confusion were a court of intermediate jurisdiction such as ours to deviate from it. We shall therefore continue to apply the rule until there shall be authoritative sanction for departure therefrom."

The claimed shortcomings of the rule are features inherent in it and have always coexisted with it. We are aware of no change in the nature or circumstances of the subject matter of its application which would justify its judicial rejection, or its restriction to mutual but equal fault cases, on the basis that it no longer serves to accomplish its original purpose. In our opinion the substi-

tution of any alternative rule is a matter for congressional rather than judicial determination.

Moreover, as late as Weyerhaeuser S. S. Co. v. United States, 372 U.S. 597, pp. 600 and 603, 83 S.Ct. 926, pp. 928 and 930, 10 L.Ed.2d the equal-division rule has been characterized as the "historic admiralty rule of divided damages in mutual fault collisions" which "for more than 100 years, has governed with at least equal clarity the correlative rights and duties of two shipowners whose vessels have been involved in a collision in which both were at fault."

■ The District Court erred in invoking the doctrine of comparative negligence. Its findings of inequality of degree of fault between the Torondoc and the city, if correct, would have afforded no basis for departing from the equal-division rule.

■ And, from our examination and consideration of the record we conclude that the District Court erred in finding the Torondoc negligent. Its finding that the Torondoc was proceeding at a speed in excess of six miles per hour is clearly erroneous. We recognize that the testimony concerning the speed of the vessels is conflicting. The court apparently relied upon estimates made by the four bridge tenders who testified for the City and who estimated the Torondoc's speed at from six to eight miles per hour. But there are factors which destroy the probative value of these estimates and serve to confirm the testimony of the masters that the Torondoc was travelling about three miles per hour as it proceeded through the Clark Street draw. Before her

engines were reversed they had been set on "standby"[3] in which setting she travelled at about three miles per hour and it had taken the vessel about one hour and ten minutes to traverse the 3.31 miles from the point of departure to the Dearborn Street bridge—an average speed of 2.8 miles per hour. The bridge tender at the Franklin-Orleans bridge, who observed the Torondoc's passage from the Lake Street bend to Wells Street, stated that she took about four minutes to travel from the north edge of Lake Street to the west edge of Franklin Street (a distance of 750 feet which by calculation shows a speed of 2.13 miles per hour) and took two minutes from Franklin to Wells (a distance of 450 feet which by calculation shows a speed of 2.65 miles per hour). The discrepancies thus disclosed between these time estimates and the speed estimates made by this and the City's other witnesses when considered in the light of the other relevant factors deprives the speed estimates of probative force. Cf. Eastern S. S. Corporation v. City of Chicago, 7 Cir., 47 F.2d 1017. If the Torondoc had been travelling at the speed the City's witnesses claim it would have come from Lake Street, around the bend, and through the four bridges (five bridge spacings) all in a three minute interval. The record does not admit of such a conclusion.

The finding that the Torondoc's master was inexperienced is wholly without support in the record.

■ There is controversy with respect to whether or not the Torondoc was required to sound her whistle for the opening of all the bridges.[4] But, on the

---

3. The Torondoc left the Halsted St. dock in this "dead slow" setting, her screw turning at 10 to 12 rpm. Her top speed is about nine miles per hour—178 to 180 rpm.

4. The libelant argues that the City is estopped from taking advantage of the Torondoc's failure to whistle in compliance with the Secretary of the Army's regulation (33 C.F.R. p. 287) by the following direction appearing in the Great

Lakes Pilot, 1957 edition, p. 175: "Elimination of Unnecessary Noise—The City of Chicago is attempting to minimize noises in that area bounded by the Michigan Avenue bridge (No. 3) on the east, the Chicago Avenue bridge (No. 45) on the north, and the Roosevelt bridge (No. 23) on the south. Pilots of vessels should give the customary whistle signal for the first bridge approached within this area and, when in the draw of the bridge, should inform the bridge tender

facts before us, it is of no import that she did not sound her whistle for the last four bridges through which she had passed prior to the collision. The bridge tender of the Dearborn Street bridge, as was the custom, had been notified by the Clark Street bridge to expect an outbound vessel—that "there is one coming through". The vessel had not then come around the bend some five blocks away and the bridge tender resumed his reading of a book. The failure of the Torondoc to sound her whistle for the intervening bridges was not a causative factor. Timely warning of the vessel's approach was given.

█ But the bridge tender did not watch for the Torondoc. He was reading. Thus he did not commence procedures to raise his bridge when the approaching vessel reached La Salle Street, as he ordinarily did. When he did look out the Torondoc was already in the Clark Street draw. He put on the flashing stop lights for street traffic but was delayed in lowering the gates until traffic cleared the bridge. It is evident that it was his belated commencement of procedures to open the bridge which brought the Torondoc to a point half way between the two bridges—within about 170 feet of the Dearborn bridge, which appeared to be in the process of opening—before the second of his three attempts to properly raise the south leaf failed. No warning that the bridge could not open was given the vessel. The court did not err in finding proximate cause of the collision in the City's negligence in failing to open the bridge or give affirmative warning. And there is support in the record for the finding of negligence based on the City's failure to inspect and test the operating mechanism or replace the old electrical components. There is conflict in the evidence on this technical point

but we cannot say the court's findings thereon are clearly erroneous.

We have considered the arguments advanced by the City with respect to the actions of the Torondoc and the tug when it became apparent the south leaf could not be raised. We are not persuaded thereby. The situation presented was one of "in extremis". It is apparent from the record that attempts were made to stop the Torondoc and to avoid collision with the south leaf. That these efforts were not successful, and the pilot house of the Torondoc did not clear the lowered north leaf, does not establish contributory fault on the part of either the steamer or the tug.

Liability here is to be measured by the standards set forth in detail by this Court in Clement v. Metropolitan West Side El. Ry. Co., 7 Cir., 123 F. 271 and applied again in Munroe v. City of Chicago, 7 Cir., 194 F. 936. Application of the teachings of those cases to the facts here involved requires the conclusion that neither the Torondoc nor the Oregon was negligent and the negligence of the City was the sole proximate cause of the collision and resulting damage.

The judgment order of the District Court is reversed and the cause is remanded to the District Court with directions to enter a judgment for libelant, N. M. Paterson & Sons, Ltd. against the City of Chicago in the amount of $15,-336.00, with interest from the date of its entry, and for costs; and to enter a judgment for respondents, N. M. Paterson & Sons, Ltd. and The Great Lakes Towing Company, Inc., with costs, on the cross-libel of the City of Chicago.

Costs in these appeals are allowed to N. M. Paterson & Sons, Ltd. and The Great Lakes Towing Company, Inc.

Reversed and remanded with directions.

---

of their destination. The bridge tenders will then telephone ahead for the necessary bridge openings. Pilots are asked not to signal for other bridge openings in

this area unless prompt service is not provided."

The Halsted Street bridge was the first bridge approached by the Torondoc.