ERIE LACKAWANNA RAILWAY CO., Plaintiff-Appellee,

v.

Robert D. TIMPANY (formerly John E. Farrell) solely as Trustee of the property of the Central Railroad Co. of New Jersey, Defendant-Appellant.

No. 571, Docket 73–2336.

United States Court of Appeals, Second Circuit.

Argued Feb. 25, 1974.

Decided April 9, 1974.

---

Timothy A. Hanan, New York City (Macklin, Hanan & McKernan, New York City, on the brief), for plaintiff-appellee.

Louis P. Sheinbaum, New York City (Bigham Englar Jones & Houston, New York City, on the brief), for defendant-appellant.

Before KAUFMAN, Chief Judge, and FEINBERG and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

This is an appeal from a judgment of the United States District Court, Southern District of New York, entered on June 8, 1973, following an opinion of the Hon. Robert L. Carter, United States District Judge, dated May 30, 1973, which found the appellant Robert D. Timpany, as Trustee of the property of the Central Railroad Co. of New Jersey (Central), solely responsible for damage in the amount of $34,000 plus interest and costs, to a hoist owned by the appellee Erie Lackawanna Railway Co. (Erie).

I

The facts in this case are not in dispute. In July, 1968, Central owned and operated a drawbridge, located at the entrance to Newark Bay, between Elizabethport and Bayonne, New Jersey, running in a general east-west direction. The drawbridge is a lift bridge, the spans of which can be vertically raised and lowered by a bridge tender, who is

employed by Central. The westerly passage for vessels has an opening of 216 feet, with a vertical clearance (between the bottom of the lift span and the water) of 35 feet at mean high water when the lift span is completely lowered and in a closed position. When fully opened, the vertical clearance in the western passage is 135 feet. Pursuant to Federal Regulation,[1] the western span is equipped with a red light in the middle of the span facing the direction of oncoming traffic, which remains lit until the span is completely raised, at which point it turns off and a green light shows.

Shortly after 3 a. m. on the morning of July 10, 1968, the tugboat NAZARETH, owned by plaintiff appellee Erie and piloted by Captain Joseph Stuchala, was proceeding from Hoboken, New Jersey to Newark Bay. The NAZARETH was towing a floating hoist secured to her port side and a barge and a scow secured to her starboard side. The towed vessels, the property of Erie, were all unmanned. The NAZARETH had a crew consisting of the Captain, a mate, two deckhands and an engineer. The hoist had a single boom which extended 80 feet in the air when in a raised position, with its base located about 75 feet from the bow of the floating hoist. The flotilla was 110 feet in length and 100 feet in width. The towed vessels were each lighted at their outside corners; the tug had a number of lights, including one on its mast, but there was no light at the end of the boom.

At about 3:25 a. m. the NAZARETH and her tow were rounding Bergen Point, proceeding toward the bridge. There was little wind, the water was calm and visibility was good. Captain Stuchala was alone at the wheel of his tug, navigating the flotilla, and the four other members of his crew were below in the galley. When he was about a half-mile away from the bridge, he gave the usual three-blast signal indicating that he wished the span over the western passage to be opened. The flotilla was proceeding at half speed to permit the Captain to line up his 100 foot wide flotilla to negotiate the 216 foot western passage. On hearing the tug signal, the bridge tender, who had been lowering the western span, stopped that operation and proceeded to raise it to a height of 75 feet. As the tug passed under the bridge, the top of the boom of the hoist hit the bridge, resulting in the $34,000 damages claimed by Erie.

On trial, Captain Stuchala testified that he had passed under the bridge between 200 and 400 times prior to the date in question, and on almost every occasion the span had raised. However, he testified that on only about 40% of these passages would the bridge be fully opened with the green light going on. He further admitted that he saw the bridge being opened but then stop opening when the flotilla was about a half-mile away. It took about fifteen minutes from the time the tug signalled until the collision occurred. It takes two and a half minutes to fully open the bridge from a totally closed position. The Captain testified that he could have stopped the flotilla within a distance of 100 feet; that he did not see any green light on the bridge; that he knew the span was only partially open; that he did not know how high the boom was in its raised position and that he could not

1. 33 C.F.R. § 68.15–20 provides as follows:
    (a) *Lift span lights.* The vertical lift span of every vertical lift bridge shall be lighted so that the center of the navigable channel under the span will be marked by a range of two green lights when the vertical lift span is open for navigation and by one red light on each side for all other positions of the lift span. The green lights shall each show through a horizontal arc of 360°; they shall be securely mounted just below the outermost edge of the bridge span structure so as to be visible from an approaching vessel. Each red light shall show through a horizontal arc of 180°, and shall be securely mounted just below the outermost edge of the lift span to show 90° on either side of the line parallel to the axis of the channel so that only one such light will be visible from an approaching vessel.

see the end of the boom from the wheelhouse. He was occupied with positioning the flotilla in the center of the draw since "you have got to be right in the center or else you will have problems, I think." No member of the crew was called on deck to assist the Captain or to act as a lookout. The bridge tender stated that he did not see the raised boom until shortly before the collision, and that he attempted to raise the span higher but without success.

Judge Carter found on these facts that Central was solely responsible for the collision.

## II

■ Erie argues that this court is bound by the finding below that Central was solely responsible for the collision unless we conclude that the finding was clearly erroneous. However, a finding of negligence or lack of negligence by a district court is not subject to the clearly erroneous rule. Dinnerstein v. United States, 486 F.2d 34, 37–38 (2d Cir. 1973); Director General of India Supply Mission v. S.S. Maru, 459 F.2d 1370, 1373 n. 3 (2d Cir. 1972), cert. denied, 409 U.S. 1115, 93 S.Ct. 898, 34 L.Ed.2d 699 (1973); In re Marine Sulphur Queen, 460 F.2d 89, 97 (2d Cir.), cert. denied, 409 U.S. 982, 93 S.Ct. 326, 34 L. Ed.2d 246 (1972); Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800, 813 (2d Cir. 1971).

■ The findings of fact are not disputed by the appellant here; there is no question of the veracity of witnesses. Rather, the appellant contests the finding of negligence, which involves "the formulation and then the application of a standard of conduct to evidentiary facts found to be established." Romero v. Garcia & Diaz, Inc., 286 F.2d 347, 355

(2d Cir.), cert. denied, 365 U.S. 869, 81 S.Ct. 905, 5 L.Ed.2d 860 (1961). The evaluation of a claim of negligence is a task which we can certainly undertake where the findings of fact of a district court are not disputed on appeal.[2] This court has held, however, that the district court's determination that a party is liable by reason of negligence "will ordinarily stand unless the lower court manifests an incorrect conception of the applicable law." Cleary v. United States Lines Co., 411 F.2d 1009, 1010 (2d Cir. 1969) (*per curiam*). In our view, we are presented with that situation here.

## III

■■ The general rule is that navigation rights take priority over the rights of surface traffic. A bridge obstructs navigation and therefore has a duty to clear the channel for navigation when necessary, to employ persons for this purpose, to maintain indicator lights and to give warning signals when a bridge cannot be opened in time or cannot be opened at all. Clement v. Metropolitan West Side El. Ry., 123 F. 271, 273 (7th Cir. 1903). In *Clement*, the court outlined the rights of a vessel:

A vessel, having given proper signal to open the bridge and prudently proceeding under slow speed, has, in the absence of proper warning, the right to assume that the bridge will be timely opened for passage. She is not bound to heave to until the bridge has been swung or raised and locked, and to critically examine the situation before proceeding . . . but may carefully proceed at slow speed upon the assumption that the bridge will open in response to the signal, and may so proceed until such time as it appears by proper warning, *or in rea-*

---

2. Appellee urges that the real issue here is one of causation not negligence, and that a finding of causation is subject to the clearly erroneous rule. United States v. Ebinger, 386 F.2d 557 (2d Cir. 1967). *Ebinger* is not in point. There the question was whether or not welding performed by the defendant was in fact the physical cause of a fire.

Here, there was no dispute about causation in fact; the term is not even employed in the opinion below. The determination challenged here deals not with the factual cause of the accident but rather with the breach of a legal duty. It is a legal conclusion on admitted facts, and therefore it is not subject to the clearly erroneous rule.

*sonable view of the situation,* that the bridge will not be opened . . . when it becomes the duty of the vessel, if possible, to stop, and, if necessary, to go astern.

*Id.* (citations omitted; emphasis added). On the facts of this case, we believe the district judge correctly found that the bridge was liable for failure to fulfill its duty to avoid accident resulting from its obstruction of the lanes of navigation. See Great Lakes Towing Co. v. Masaba S.S. Co., 237 F. 577 (6th Cir. 1916); Department of Highways v. McWilliams Dredging Co., 85 F.Supp. 714 (W.D.La.1949); M & M Dredging & Constr. Co. v. Miami Bridge Co., 39 F.Supp. 311 (S.D.Fla.1941).

■ Our concern here, however, is whether or not, "in reasonable view of the situation," the tug should have continued ahead or taken evasive action. On the record before us, we conclude that the NAZARETH also failed in its duty to avoid collision, and that Erie therefore was also guilty of negligence. Southern Transp. Co. v. City of New York, 98 F.Supp. 967 (S.D.N.Y.1950), aff'd, 190 F.2d 1023 (2d Cir. 1951) (*per curiam*).

Captain Stuchala was aware that the drawbridge did not usually open to provide maximum clearance and he knew particularly that the span was not raised completely on this occasion as the flotilla approached. Although he was aware of the fact that he was towing a hoist with an elongated boom, he could not tell how high the boom extended. Nonetheless, he proceeded ahead on the assumption that he had sufficient clearance. He did not stop his vessel to assess the situation, although he did admit that this could have been easily accomplished. He made no effort to have the bridge raised to its fullest height of 135 feet, which would have eliminated any chance of col-

lision. The record clearly indicates that he was fully concentrating his attention on placing the flotilla, almost as wide as it was long, in the middle of the passage in order to avoid lateral obstructions. Under all of these circumstances, we think it was unreasonable for the vessel not to have taken some minimal steps to avoid possible accident.

Any doubt about this is removed by the failure of the tug to have any lookout posted. The Captain, who, as noted, admitted that he could not see the tip of the boom from the wheelhouse, was alone in the wheelhouse navigating the flotilla, and his four crew members were in the galley. This failure to post a lookout constituted an admitted statutory violation.[3] In Circle Line Sightseeing Yachts, Inc. v. City of New York, 283 F.2d 811 (2d Cir. 1960), cert. denied, 365 U.S. 879, 81 S.Ct. 1030, 6 L. Ed.2d 191 (1961), this court, in a similar case of collision between a vessel without a lookout and a bridge, invoked the rule of The Pennsylvania, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148, (1873), which places the burden upon the vessel to establish that such a failure did not cause and could not have caused the accident. This statutory violation issue was not raised below, but we see no point in remanding on the question because the record before us makes it evident that there is no possibility that the vessel might establish that the absence of a lookout *could not have* caused the collision. Erie argues that a lookout would not have been able to judge the clearance because it was dark and the end of the boom to be observed was high in the air, and that a lookout would therefore have been superfluous. This misses the point. While the lookout might not have been able to make the judgment that the clearance was insufficient, he most certainly would have at least recognized the danger of pro-

3. 33 U.S.C. § 221 provides as follows:

Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

ceeding ahead and alerted the Captain to the admittedly unrecognized peril. In *Circle Line,* where the vessel made the same argument that it was difficult to see the opening, Judge Clark pointedly observed that "this seems to increase rather than decrease the importance of an independent lookout." *Id.* 283 F.2d at 815.

*Circle Line* makes it further clear that the person in charge of navigation cannot act as a lookout "because his work in managing the ship prevents his giving undivided attention to possible obstructions or dangers." *Id.* 283 F.2d at 814–815. In that case, the captain was navigating the vessel and a mate was present in the pilothouse but was not "looking." Here, the Captain was the only person above decks and his view of the end of the boom was blocked. In view of all the other circumstances which we have listed, the additional failure to post a lookout makes the finding of negligence on the part of Erie inescapable.

The district court found the case before us to be on all fours with Pennsylvania R.R. v. S.S. Marie Leonhardt, 202 F.Supp. 368 (E.D.Pa.1962), aff'd, 320 F.2d 262 (3d Cir. 1963). We cannot agree. In that case the vessel which collided with a bridge was exonerated from any liability because the bridge had previously instructed the vessel by telephone to come ahead. There was no unambiguous invitation here. There was no communication between the two except the whistle blast. The bridge was only partially open but the Captain, knowing that this was its usual response, nonetheless proceeded blindly ahead in the darkness of the night with an unlighted raised boom in tow.

We think that this case is closer to The No. 9, 258 F. 693 (D.Del.1919), in which, under similar factual circumstances, a mast of a towed barge collided with a partially opened bridge. The captain knew that the bridge did not always fully open due to mechanical difficulties. The court held that pru-

dent navigation and reasonable care would dictate that the captain anticipate the probable failure of the draw to open. While there was no mechanical failure present here, the tug's captain did know that the bridge did not customarily open to its full height. We think that the dictates of reasonable and prudent seamanship commanded evasive action here.

Of course, as we have indicated, the bridge tender was equally negligent in not making the timely observation which could have avoided the accident. Since both parties were at fault, damages should be equally divided between them. Diesel Tanker F. A. Verdon, Inc. v. Stakeboat No. 2, 340 F.2d 465 (2d Cir. 1965); N. M. Paterson & Sons, Ltd. v. City of Chicago, 324 F.2d 254 (7th Cir. 1963); Great Lakes Towing Co. v. Masaba S.S. Co., *supra,* 237 F. at 580–581; G. Gilmore & C. Black, The Law of Admiralty § 7–17 (1957). The judgment is therefore modified in accordance with this opinion. The Hygrade No. 12 v. The Talisman, 153 F.2d 52 (2d Cir. 1946).