Petitions of The KINSMAN TRANSIT COMPANY, as Owner and Operator of the STEAMER MacGILVRAY SHIRAS, Appellant,

and of

Midland Steamship Line, Inc., as Owner and Operator of the STEAMER MICHAEL K. TEWKSBURY, their Engines, etc., Appellee,

for Exoneration from or Limitation of Liability,

City of Buffalo, Claimant-Respondent-Appellant,

Kelley Island New York Corporation, et al., Claimants-Appellees.

Nos. 238–243, Dockets 28387–28392.

United States Court of Appeals Second Circuit.

Argued March 3, 1964.

Decided Oct. 29, 1964.

As Modified on Denial of Petition for Rehearing of Continental Grain Co., Dec. 1, 1964.

Harrison, Buffalo, N. Y., on brief), for Kinsman Transit Co.

John T. Jaeger, Johnson, Branand & Jaeger, Cleveland, Ohio (Robert Branand, Cleveland, Ohio, and Robert M. Hitchcock, Buffalo, N. Y., of counsel; Phillips, Mahoney, Lytle, Yorkey & Letchworth, Buffalo, N. Y., on brief), for Midland S.S. Line, Inc.

W. M. Connelly, Hamilton, Dobmeier, Connelly & Kirchgraber, Buffalo, N. Y., for Tomlinson Fleet and others.

Arthur E. Otten, Buffalo, N. Y., (Brennan & Brennan, Buffalo, N. Y., on brief), for Kelley Island New York Corp. and Moira C. McGrane.

Before WATERMAN, MOORE and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge:

We have here six appeals, 28 U.S.C. § 1292(a) (3), from an interlocutory decree in admiralty adjudicating liability. The litigation, in the District Court for the Western District of New York, arose out of a series of misadventures on a navigable portion of the Buffalo River during the night of January 21, 1959. The owners of two vessels petitioned for exoneration from or limitation of liability; numerous claimants appeared in these proceedings and also filed libels against the Continental Grain Company and the City of Buffalo, which filed cross-claims. The proceedings were consolidated for trial before Judge Burke. We shall summarize the facts as found by him:

The Buffalo River flows through Buffalo from east to west, with many turns and bends, until it empties into Lake Erie. Its navigable western portion is lined with docks, grain elevators, and industrial installations; during the winter, lake vessels tie up there pending resumption of navigation on the Great Lakes, without power and with only a shipkeeper aboard. About a mile from the mouth, the City of Buffalo maintains a lift bridge at Michigan Avenue. Thaws and rain frequently cause freshets to develop in the upper part of the

Edward J. Desmond, Buffalo, N. Y., Elmer S. Stengel, Corp. Counsel, City of Buffalo (John E. Drury, Jr., Buffalo, N. Y., of counsel), for City of Buffalo.

David S. Jackson, Buffalo, N. Y. (Roy P. Ohlin, Buffalo, N. Y., Wilbur H. Hecht, John J. Sullivan, New York City, of counsel, Ohlin, Damon, Morey, Sawyer & Moot, Buffalo, N. Y., and Mendes & Mount, New York City on brief), for Continental Grain Co.

Lee C. Hinslea and Lucian Y. Ray, McCreary, Hinslea & Ray, Cleveland, Ohio (James P. Heffernan, Buffalo, N. Y., of counsel; Coffey, Heffernan &

river and its tributary, Cazenovia Creek; currents then range up to fifteen miles an hour and propel broken ice down the river, which sometimes overflows its banks.

On January 21, 1959, rain and thaw followed a period of freezing weather. The United States Weather Bureau issued appropriate warnings which were published and broadcast. Around 6 P.M. an ice jam that had formed in Cazenovia Creek disintegrated. Another ice jam formed just west of the junction of the creek and the river; it broke loose around 9 P.M.

The MacGilvray Shiras, owned by The Kinsman Transit Company, was moored at the dock of the Concrete Elevator, operated by Continental Grain Company, on the south side of the river about three miles upstream of the Michigan Avenue Bridge. She was loaded with grain owned by Continental. The berth, east of the main portion of the dock, was exposed in the sense that about 150′ of the Shiras' forward end, pointing upstream, and 70′ of her stern—a total of over half her length—projected beyond the dock. This left between her stem and the bank a space of water seventy-five feet wide where the ice and other debris could float in and accumulate. The position was the more hazardous in that the berth was just below a bend in the river, and the Shiras was on the inner bank. None of her anchors had been put out. From about 10 P.M. large chunks of ice and debris began to pile up between the Shiras' starboard bow and the bank; the pressure exerted by this mass on her starboard bow was augmented by the force of the current and of floating ice against her port quarter. The mooring lines began to part, and a "deadman," to which the No. 1 mooring cable had been attached, pulled out of the ground—the judge finding that it had not been properly constructed or inspected. About 10:40 P.M. the stern lines parted, and the Shiras drifted into the current. During the previous forty minutes, the shipkeeper took no action to ready the anchors by releasing the devil's claws;

when he sought to drop them after the Shiras broke loose, he released the compressors with the claws still hooked in the chain so that the anchors jammed and could no longer be dropped. The trial judge reasonably found that if the anchors had dropped at that time, the Shiras would probably have fetched up at the hairpin bend just below the Concrete Elevator, and that in any case they would considerably have slowed her progress, the significance of which will shortly appear.

Careening stern first down the S-shaped river, the Shiras, at about 11 P.M., struck the bow of the Michael K. Tewksbury, owned by Midland Steamship Line, Inc. The Tewksbury was moored in a relatively protected area flush against the face of a dock on the outer bank just below a hairpin bend so that no opportunity was afforded for ice to build up between her port bow and the dock. Her shipkeeper had left around 5 P.M. and spent the evening watching television with a girl friend and her family. The collision caused the Tewksbury's mooring lines to part; she too drifted stern first down the river, followed by the Shiras. The collision caused damage to the Steamer Druckenmiller which was moored opposite the Tewksbury.

Thus far there was no substantial conflict in the testimony; as to what followed there was. Judge Burke found, and we accept his findings as soundly based, that at about 10:43 P.M., Goetz, the superintendent of the Concrete Elevator, telephoned Kruptavich, another employee of Continental, that the Shiras was adrift; Kruptavich called the Coast Guard, which called the city fire station on the river, which in turn warned the crew on the Michigan Avenue Bridge, this last call being made about 10:48 P.M. Not quite twenty minutes later the watchman at the elevator where the Tewksbury had been moored phoned the bridge crew to raise the bridge. Although not more than two minutes and ten seconds were needed to elevate the bridge to full height after traffic was

stopped, assuming that the motor started promptly, the bridge was just being raised when, at 11:17 P.M., the Tewksbury crashed into its center. The bridge crew consisted of an operator and two tenders; a change of shift was scheduled for 11 P.M. The inference is rather strong, despite contrary testimony, that the operator on the earlier shift had not yet returned from a tavern when the telephone call from the fire station was received; that the operator on the second shift did not arrive until shortly before the call from the elevator where the Tewksbury had been moored; and that in consequence the brige was not raised until too late.

The first crash was followed by a second, when the south tower of the bridge fell. The Tewksbury grounded and stopped in the wreckage with her forward end resting against the stern of the Steamer Farr, which was moored on the south side of the river just above the bridge. The Shiras ended her journey with her stern against the Tewksbury and her bow against the north side of the river. So wedged, the two vessels substantially dammed the flow, causing water and ice to back up and flood installations on the banks with consequent damage as far as the Concrete Elevator, nearly three miles upstream. Two of the bridge crew suffered injuries. Later the north tower of the bridge collapsed, damaging adjacent property.

Judge Burke concluded that Continental and the Shiras had committed various faults discussed below; that the faults of the Shiras were without the privity or knowledge of her owner, thus entitling Kinsman to limit its liability,[1] 46 U.S.C. § 183; that the Tewksbury and her owner were entitled to exonera-

tion; and that the City of Buffalo was at fault for failing to raise the Michigan Avenue Bridge. The City was not faulted for the manner in which it had constructed and maintained flood improvements on the river and on Cazenovia Creek, or for failing to dynamite the ice jams. For the damages sustained by the Tewksbury and the Druckenmiller in the collisions at the Standard Elevator dock, Judge Burke allowed those vessels to recover equally from Continental and from Kinsman, jointly and severally, subject however, to the latter's right to limit liability. He held the City, Continental and Kinsman equally liable jointly and severally (again subject to Kinsman's limitation of liability) for damages to persons and property sustained by all others as a result of the disaster at the bridge.[2] But, on the basis of the last clear chance rule, he held the City solely liable for damages sustained by the other tort-feasors, to wit, the Shiras and Continental as operator of the Concrete Elevator, and refused to allow recovery by the City against them.

The complaints as to the judge's determinations are so numerous that, in order to deal properly with the most serious ones and avoid inordinate length, we must state our conclusions on the others in rather summary fashion:

(1) *Non-liability of the City of Buffalo for action and inaction in the upper reaches of the Buffalo River and Cazenovia Creek.*

On conflicting evidence, the trial judge concluded that the City had not created "a special hazard of ice jams" by its construction, completed twenty and thirty years previously, and its maintenance thereafter of flood improvements in the Buffalo River and

---

1. The limitation fund was determined to be $76,788.45, the value of the Shiras and her freight, augmented by the amount to be realized on Kinsman's claim against the City; Kinsman does not appear to have asserted a claim against Continental. We assume the dollar figure was intended to bear interest. See 3 Benedict, Admiralty p. 573 (1940). Kinsman's brief conceded that the limitation amount

stated in the interlocutory decree does not relate to the two personal injury claims. 46 U.S.C. § 183(b)–(f). But see 46 U.S.C. § 188 and Gilmore & Black, Admiralty, § 10–35 (1956).

2. The judge reduced the personal injury claim of the bridge operator on the 11 P.M. shift by 50% for contributory negligence; he has not appealed.

Cazenovia Creek; he further found that the City's failure to dynamite ice jams on January 21, 1959, was not negligent. Since we accept these conclusions, it is immaterial at this point that we would disagree, for reasons later intimated, with his ruling that "the claimed faults on the part of the City in creating and failing to control those conditions were not proximately contributing causes" since "the disaster would not have occurred without the actionable faults of Continental and the Shiras." Nor need we reach the City's contention that it could not in any event be cast in liability for deficiencies in the improvements, the original plan for which had been submitted to the Secretary of War under the Act of March 3, 1899, 33 U.S.C. § 403, or for failure to take ameliorative action, either by way of further construction or through dynamiting, which allegedly would have been only voluntary on its part. Cf. Faust v. City of Cleveland, 121 F. 810 (6 Cir. 1903). But see City of Detroit v. Wyandotte Transp. Co., 76 F.2d 674 (6 Cir.), cert. denied, 296 U.S. 595, 56 S.Ct. 112, 80 L.Ed. 422 (1935).

(2) *Negligence of Kinsman and Continental.*

■ The mooring of the Shiras, as to which more will be said under the next heading, was the joint work of Kinsman, acting through Captain Davies, her former master, and of Continental. The judge was justified in holding that, with her bow protruding into the river just below a bend and with the eroded bank incapable of taking a long lead line or an anchor chain, the Shiras ought to have put out an anchor from her port bow. He was also warranted in finding that Continental was at fault for the inadequately secured "deadman" and the Shiras for the shipkeeper's failure to ready the anchors in the interval between 10 P.M. and 10:40 P.M. on January 21. The current and ice conditions on the fateful evening were not so unexpectable as to go beyond the range of foreseeability and hence to come within the principle of inevitable accident; the conditions were of the very sort that had been occurring for years, although not in quite the same degree. Kinsman and Continental say that no ship had drifted loose in the river as the result of the breaking of an ice jam since an episode in 1916 relating to The Anna C. Minch, 271 F. 192 (2 Cir. 1921), and that we exonerated her. However, the basis for exoneration was not that the strong currents and heavy ice were unexpectable but that the Minch had taken all reasonable precautions against them.

(3) *Limitation of Kinsman's liability.*

We find this issue more difficult; some further statement of the facts is required.

Kinsman's principal office is in Cleveland. It owned five vessels, four of which were in Buffalo in the winter of 1958–59. Kinsman is a family corporation; Henry Steinbrenner was its president and his son, George, then only twenty-eight years old and without maritime studies or experience, had become its vice president and treasurer in 1957.

The Shiras arrived in Buffalo with a cargo of grain for Continental late in November and was moored for the winter at the coal dock of the Lackawanna Railroad in the ship canal. Inspection of the grain revealed heating, which made it desirable to unload the Shiras and then reload her for further storage. George Steinbrenner went to Buffalo on December 8 to work out the plans; he returned to Cleveland on the 12th and, having gone to Florida on a vacation, was not in Buffalo again until after the accident. It is not shown that he had knowledge of the precise place where or the manner in which the Shiras would ultimately be moored.

When Kinsman had mooring or loading problems in Buffalo during the winter, it sometimes relied on its agents, Boland & Cornelius, and sometimes would dispatch one of its masters, grounded for the winter, who were paid for such work on a per diem basis. On this occasion it took the latter course. Henry Steinbrenner assigned the task

to Captain Davies who had been master of the Shiras during the 1958 season. Davies came to Buffalo on three occasions. On the first he supervised the shifting of the Shiras to the unloading leg of the Concrete Elevator dock, on the second to the loading leg, and on the third, January 7, to the place east of the loading leg where she was expected to remain moored for the rest of the winter. The remooring was effected, without the aid of tugs, by a gang of Continental employees bossed by Kruptavich, which placed the lines on the shore. Kinsman had never made any effort to obtain information as to winter weather or harbor conditions in Buffalo but relied on inspection and approval by United States Salvage Association, which was employed to that end by the Great Lakes, Protective Association, a mutual insurance association of steamship operators. Rozycki, a marine surveyor employed by United States Salvage, inspected the mooring on January 8 and made a favorable report; a formal certificate of approval was later sent to Henry Steinbrenner.

▮ The case gives point to the comment that the statutory phrase, "without the privity or knowledge of such owner," is largely "devoid of meaning," Gilmore & Black, Admiralty, 695 (1957)—a statement supplemented with the admittedly unhelpful comment: "Where a vessel is held in corporate ownership, the imputation of 'privity or knowledge' to the corporate owner will be made if a corporate officer sufficiently high in the hierarchy of management is chargeable with the requisite knowledge or is himself responsible on a negligence rationale. How high is 'sufficiently high' will depend on the facts of particular cases * * *." Ibid. 701. Henry and George Steinbrenner were "sufficiently high," but George had no knowledge of the mooring, and Henry had none save for Davies' report on his return from Buffalo and the United States Salvage certificate, both of which were reassuring rather than the reverse. They were not negligent in assigning the

task to Davies, whose competence was established. Davies was not "sufficiently high," under the authorities cited below. His knowledge is imputed to the corporation on the issue of exoneration, but that is precisely what the statute forbids on the issue of limitation. Still it seems likely that if Kinsman's headquarters had been in Buffalo, limitation would be denied under Spencer Kellogg & Sons v. Hicks, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932), on the basis that it was negligent not to check the adequacy of the mooring of the Shiras when dangerous conditions threatened on January 21, or even that it was negligent to fail to make a cautionary inspection of the moorings of Kinsman's vessels in the harbor at an earlier date. If the latter view were taken, one might query the good sense of a distinction that would lead to a different result in this age of rapid transportation and communication because Kinsman's office was a few hundred miles away from the harbor where four of its five ships were berthed. The query seems especially pertinent when, as here, there is every indication that nothing different would have been done if George Steinbrenner had been on the scene during the final mooring as he had entrusted the operation to one admittedly more competent to oversee it than he was. Indeed, the whole rationale of the doctrine is of questionable application in a case like this where there was no need for the owner to rely on the skill of a master or other agents as he must when a vessel is at sea or in a distant port. All this, however, is not for us; shipowners and their insurers are entitled to rely on the statute and the decisions applying it, and we must take these as we find them until a higher authority intervenes. Although we doubt that the decisions can all be reconciled, this case is closer to Craig v. Continental Ins. Co., 141 U.S. 638, 12 S.Ct. 97, 35 L.Ed. 886 (1891); Quinlan v. Pew, 56 F. 111 (1 Cir. 1893); The Annie Faxon, 75 F. 312 (9 Cir. 1896), and The Erie Lighter 108, 250 F. 490 (D.N.J.1918), allowing limitation,

than to McGill v. Michigan SS. Co., 144 F. 788 (9 Cir.), cert. denied, 203 U.S. 593, 27 S.Ct. 782, 51 L.Ed. 332 (1906); The Marguerite, 140 F.2d 491 (7 Cir. 1944); The Cleveco, 154 F.2d 605 (6 Cir. 1946); The Edmund Fanning, 105 F. Supp. 353, 363–366, 371 (S.D.N.Y. 1952), aff'd as to this point, 201 F.2d 281 (2 Cir. 1953), and States SS. Co. v. United States, 259 F.2d 458 (9 Cir. 1957), cert. denied, 358 U.S. 933, 79 S. Ct. 316, 3 L.Ed.2d 305 (1959); Admiral Towing Co. v. Woolen, 290 F.2d 641 (9 Cir. 1961), and The Derrick Trenton, 189 F.Supp. 400 (S.D.N.Y.1960), denying it. We are aware of the difference in the ages of the two sets of decisions, but we find nothing in the later cases reflecting on the authority of the earlier ones on fact situations within their sweep—a view which Coryell v. Phipps, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943), tends to confirm.

 Two other points must be considered. If the Shiras was not seaworthy in what has been termed the "primitive sense" of being "tight, staunch, strong and well and sufficiently tackled, appareled, furnished and equipped," a corporate owner who has failed in his duty to provide such a ship does not escape full liability, Gilmore & Black, supra, 702. It is argued that the Shiras was unseaworthy in this sense on the basis that although she put out all the mooring lines she had, their number was inadequate. The latter claim was the subject of conflicting testimony, and we take the judge's failure to fault the Shiras on this score as a finding, not clearly erroneous, that the claim was not established. Continental's claim that, under the "personal contract" exception, Gilmore & Black, Admiralty, §§ 10–26ff., Kinsman may not limit liability to it because of breach of the warranty of

seaworthiness in the storage contract signed by Henry Steinbrenner, is defeated both by lack of proof of breach [3] and by the fact that the exception would apply only to damage to the stored cargo, which did not occur. See 3 Benedict, Admiralty, 373 (1940).

### (4) Exoneration of Midland and of the Tewksbury.

 The exoneration of the Tewksbury and of her owner is challenged by the argument that the Tewksbury should have put out an anchor and an anchor chain and that it was negligent for her shipkeeper to be away. As to the former we see no sufficient reason to reject the judge's conclusion that, in view of the Tewksbury's sheltered position, the omission to take these added precautions, even in the conditions that had developed on January 21, was not negligent. As to the second point, it is not altogether clear whether the judge rested his conclusion on absence of negligence and also on lack of causal relation or solely on the latter. We should have difficulty in saying it was not negligent to leave the Tewksbury unguarded on what was known to be a perilous night, especially in view of the Buffalo ordinance forbidding any "master or other person owning or having charge of any vessel" to leave her in the harbor "without having on board or in charge thereof some competent person to control, manage or secure the same, without first obtaining permission of the harbor master." But we accept the judge's conclusion that the shipkeeper's presence would not have averted the disaster. The only ameliorative measure which it is suggested he might have taken is the dropping of the one anchor left to the Tewksbury after the Shiras destroyed the other. But it is highly questionable whether such action would have had a

---

3. Although the shipkeeper's failure to ready the anchors may have rendered the Shiras unseaworthy in the expanded sense used in seamen's personal injury actions, the contractual warranty is for "The fitness of the ship at the moment of breaking ground * * *, and not

her suitability under conditions thereafter arising which are beyond the owner's control." Cullen Fuel Co. v. W. E. Hedger, Inc., 290 U.S. 82, 89, 54 S.Ct. 10, 11, 78 L.Ed. 189 (1933); The Soerstad, 257 F. 130 (S.D.N.Y.1919).

significant effect on the short rock-bottomed stretch between the Standard Elevator and the bridge. See The Anna C. Minch, 260 F. 522, 527 (W.D.N.Y.); 271 F. 192, 198 (2 Cir. 1921). Moreover, the shipkeeper might well have been reasonably reluctant to drop an anchor knowing that if it held, the Shiras would crash into the Tewksbury again.

We thus come to what we consider the most serious issues: (I) Whether the City of Buffalo was at fault for failing to raise the bridge on learning of the prospective advent of the Shiras and the Tewksbury; (II) the consequences of the time relation of the City's failure to the prior faults of the Shiras and Continental; and (III) the effect of the allegedly unexpectable character of the events leading to much of the damage—and here of the Palsgraf case, infra.

I. *The City's failure to raise the bridge.*

If this were a run of the mine negligence case, the City's argument against liability for not promptly raising the Michigan Avenue Bridge would be impressive: All the vessels moored in the harbor were known to be without power and incapable of controlled movement save with the aid of tugs. The tugs had quit at 4 P.M.; they were not docked in the river, and would not undertake after quitting time to tow a vessel into or out of the inner harbor. Since the breaking loose of a ship was not to be anticipated, it would have been consistent with prudence for the City to relieve the bridge crews of their duties.[4] Neglect by the crews ought not subject the City to liability merely because, out of abundance of caution, it had ordered them to be present when prudence did not so require. The case is unlike those in which a railway or a city, having undertaken to give warning signals at a crossing although under no duty to do so, is

held liable to a plaintiff who relied on the absence of warning when it failed to continue its practice. See Prosser, Torts, 187, and fn. 87 (1955). It would be nonsense to suppose that Continental and the Shiras did what they did, and didn't what they didn't, in reliance on the bridge operators being sufficiently alert to avert disaster if the Shiras should break loose.

Buffalo's adversaries answer with § 4 of the Bridge Act of 1906, 33 U.S.C. § 494, which requires, inter alia, that if a bridge over a navigable stream "shall be constructed with a draw, then the draw shall be opened promptly by the persons owning or operating such bridge upon reasonable signal for the passage of boats and other water craft." Buffalo replies that this general language cannot reasonably be construed to require that all drawbridges over all navigable streams in all fifty states shall be tended at all times of day or night, summer or winter, despite the near certainty that no traffic will approach. Alternatively it is arguable that a signal given when no traffic was to be expected would not be a "reasonable signal" unless this gave the bridge owner reasonable time to get someone down to the bridge to open it. However, an older statute, 28 Stat. 362 (1894), as amended, 33 U.S.C. § 499, makes it "the duty of all persons owning, operating, and tending the drawbridges * * * across the navigable rivers and other waters of the United States, to open, or cause to be opened, the draws of such bridges under such rules and regulations as in the opinion of the Secretary of the Army the public interests require to govern the opening of drawbridges for the passage of vessels and other watercrafts, and such rules and regulations, when so made and published, shall have the force of law. * * * " The section goes on to authorize the promulgation of such

4. The claimants cannot prevail on their argument that the City was bound to see to it that the bridge could be opened at all times to permit passage of the tug maintained by the fire department west of

the bridge. Violation of a duty to take steps that would mitigate fire would not subject the City to liability for what occurred—the harm must be "within the risk." See note 9, infra.

# 718

regulations by the Secretary of the Army and to make it a misdemeanor to delay unreasonably the opening of a draw after reasonable signal. Pursuant to this authority, the Corps of Engineers promulgated 33 C.F.R. § 203.707, as follows:

"(a) The Michigan Avenue bridges across Buffalo River and Buffalo Ship Canal will not be required to open for the passage of vessels from 7:00 to 7:30 a. m., 8:00 to 8:30 a. m., 3:45 to 4:30 p. m., and 5:15 to 6:00 p. m.

\* \* \* \* \* \*

"(d) The closed periods prescribed in this section shall not be effective on Sundays and on New Year's day \* \* \* [and other holidays].

"(e) The draws of these bridges shall be opened promptly on signal for the passage of any vessel at all times during the day or night except as otherwise provided in this section." [None of the unquoted subsections provide otherwise.]

 It is possible to read this statute and the regulations thereunder as creating by implication a cause of action, irrespective of negligence, for any person, or at least for any ship, injured by their breach. The power of Congress with respect to navigable streams is plenary; nothing prevents Congress from "abating any erections that may have been made, and preventing any others from being made, except in conformity with such regulations as it may impose." Willamette Iron Bridge Co. v. Hatch, 125 U.S. 1, 12–13, 8 S.Ct. 811, 817, 31 L.Ed. 629 (1888). Responsive to that decision Congress has enacted that "The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; \* \* \*," 33 U.S.C. § 403; the Michigan Avenue Bridge was allowed to exist only subject to the conditions as to its raising previously stated. However, we are not here required to decide whether the statute and regulations create such

an implied cause of action and, if so, in whose favor. See United States v. Perma Paving Co., 332 F.2d 754 (2 Cir. 1964). It is enough for this case that they lay down a standard of care with which bridge owners must comply in the absence of circumstances, not here present, excusing such compliance.

 There can be no question as to this being so with respect to vessels in the ordinary course of navigation. City of Chicago v. Chicago Transp. Co., 222 F. 238, L.R.A.1915F, 1062 (7 Cir.), cert. denied, 238 U.S. 626, 35 S.Ct. 664, 59 L.Ed. 1495 (1915); City of Cleveland v. McIver, 109 F.2d 69 (6 Cir.1940). Cf. Nassau County Bridge Auth. v. Tug Dorothy McAllister, 207 F.Supp. 167 (E.D.N.Y.1962), aff'd 315 F.2d 631 (2 Cir. 1963). The same rule has been held applicable as to drifting vessels, Dorrington v. City of Detroit, 223 F. 232 (6 Cir. 1915). Although these were doubtless not in the forefront of Congress' mind, they too were within the general purpose of insuring freedom of navigation at which the statute was aimed. Compare De Haen v. Rockwood Sprinkler Co., 258 N.Y. 350, 179 N.E. 764 (1932); Urie v. Thompson, 337 U.S. 163, 191, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949); contrast Gorris v. Scott, L.R. 9 Ex. 125 (1874), and see A. L. I. Restatement 2d, Torts § 286 (Tent.Draft No. 4, April, 1959), and Prosser, Torts, 157–58 (1955). The effect of the Corps of Engineers' regulation was to withdraw decision as to when the bridge might be left untended from what would otherwise have been a permissible area for exercise of the City's prudent judgment. See The Pennsylvania, 19 Wall. (86 U.S.) 125, 22 L.Ed. 148 (1874). Indeed, Buffalo exercised no judgment contrary to the regulation; the fault lay in its employees' failure to carry out the United States' commands and those of their employer.

II. *The time relation of the City's failure to the prior faults of the Shiras and Continental.*

All three parties held liable complain of the effect which the judge gave to the failure of the City to raise the bridge.

Kinsman and Continental contend that the City's failure insulates them from liability for damages to others resulting from the collision at the bridge; the City objects to the imposition of sole liability for damage to the Shiras and to Continental and to the exoneration of these parties from liability for destruction of the bridge.

 We speedily overrule the objections of Kinsman and Continental. Save for exceptions which are not here pertinent, an actor whose negligence has set a dangerous force in motion is not saved from liability for harm it has caused to innocent persons solely because another has negligently failed to take action that would have avoided this. See A. L. I. Restatement, Torts §§ 439, 447 and 452; Restatement 2d Torts §§ 442A, 442B, and 452(1), comments *b* and *c* (Tent.Draft No. 9, April, 1963); Harper & James, The Law of Torts, 1146 (1956); James, Last Clear Chance: A Transitional Doctrine, 47 Yale L.J. 704, 708 (1938). As against third persons, one negligent actor cannot defend on the basis that the other had "the last clear chance." See Prosser, Torts, 291 and fn. 72 (1955); Bohlen, Contributory Negligence, 21 Harv.L.Rev. 233, 237–41 (1908); MacIntyre The Rationale of Last Clear Chance, 53 Harv.L.Rev. 1225, 1234–35 (1940). The contrary argument grows out of the discredited notion that only the last wrongful act can be a cause—a notion as faulty in logic as it is wanting in fairness. The established principle is especially appealing in admiralty which will divide the damages among the negligent actors or non-actors.

 On the other hand, we disagree with the judge's holding that because the City had "the last clear chance," Kinsman and Continental as plaintiffs against it are absolved of their negligence and the City as plaintiff is left without recourse against them. Here, as in the case of the injuries to persons not at fault, the damages should be divided. Explanation of our reasons requires some analysis of the origin of the last clear chance rule and of its application in admiralty.

As has been pointed out, the earliest common law decisions upholding the defense of contributory negligence were cases where the plaintiff's negligence came later than the defendant's and rested on the now discarded belief that only the last negligent act could be a legal cause. See Bohlen, Contributory Negligence, supra, 21 Harv.L.Rev. at 238; 8 Holdsworth, A History of English Law 459 (2d ed. 1925); Harper & James, supra, 1241–45. This same notion that had thus given rise to contributory negligence as a complete defense then became the basis for avoiding it; the first and still the most current explanation of the last clear chance rule is that under such circumstances the plaintiff's negligence is not a proximate cause of his injury. Dowell v. General Steam Nav. Co., 5 El. & Bl. 195 (1855); Tuff v. Warman, 5 C.B. (N.S.) 573, 585, 141 Eng.Rep. 231, 236 (1858). The error in this has been often demonstrated, see Prosser, Torts, 291; Harper & James, The Law of Torts, 1244, and fn. 18; the theory is, of course, entirely inconsistent with the acknowledged right of third persons to recover against the first as well as the second actor in the temporal chain. But, despite its demonstrable fallacy, the last clear chance doctrine has remained popular at common law as ameliorating the harshness of the rule whereby a negligent act of the plaintiff, often very slight in comparison to the dangerous conduct of the defendant, would otherwise bar recovery.

Although it might have been thought that the less severe consequences attributed to contributory negligence by the admiralty would have prevented the last clear chance doctrine from entering maritime law, see The Norman B. Ream, 252 F. 409, 414 (7 Cir.1918), a number of factors dictated otherwise. One was the influence of English cases in the common law courts involving collisions in territorial waters; another was the manning of the Court of Appeal and the House of Lords and of both trial and ap-

pellate admiralty tribunals in this country with lawyers whose principal training was in the common law; a third—no longer applicable in England since the Brussels Rules for apportioning damages in proportion to fault were adopted by the Maritime Conventions Act, 1 & 2 Geo. V, c. 57, § 1(1) (1911), but highly influential here—is that the doctrine, selectively applied, has helped to overcome results of the equal division principle which are sometimes quite as shocking as those of the common law bar for contributory negligence—especially in cases where reliance by a relatively innocent plaintiff on the "major-minor fault" exception has been thought to be barred by the rule of The Pennsylvania, 19 Wall. (86 U.S.) 125, 22 L.Ed. 148 (1874), that a party to a collision who has violated a statutory rule of navigation may not escape liability except on proof that the violation could not have contributed to the accident. See MacIntyre, supra, 53 Harv.L.Rev. at 1236–41; Gilmore & Black, Admiralty, 403–407, 438–442.

None of the cases in which this Court has applied the last clear chance rule to impose sole liability in admiralty is at all analogous to this one; indeed we doubt whether this case would come within the principle as generally applied at common law. One line of authority that is plainly distinguishable is where the vessel committing the later fault was contractually bound to care for the one guilty of an earlier fault of which the vessel held solely liable had become aware—typified by the tug that neglects a leaky tow, as in Henry Du Bois Sons Co. v. Pennsylvania RR., 47 F.2d 172 (2 Cir.1931), or in what was fated to be Judge Learned Hand's last opinion, Chemical Transporter, Inc. v. M. Turecamo, Inc., 290 F.2d 496 (2 Cir.1961). See also Sternberg Dredging Co. v. Moran Towing and Transp. Co., 196 F.2d 1002 (2 Cir.1952). In the other cases relied on by Continental and the Shiras, as in those just cited, the vessel solely charged had engaged in dangerous conduct in full knowledge of the peril created by the other's fault, often small although statutory. The Perseverance,

63 F.2d 788 (2 Cir.), cert. denied sub nom. Cornell Steamboat Co. v. Lavender, 289 U.S. 744, 53 S.Ct. 692, 77 L.Ed. 1490 (1933); The Sanday, 122 F.2d 325 (2 Cir. 1941); The Socony No. 19, 29 F.2d 20 (2 Cir. 1928); The Syosset, 71 F.2d 666 (2 Cir. 1934); The Cornelius Vanderbilt, 120 F.2d 766 (2 Cir. 1941). Indeed, in the three cases last cited it is not altogether clear that the fault of the exonerated vessel was a "cause" in the sense that the accident was within the risk that made her action negligent. Furthermore, if, as we believe, what really happened here was that neither of the bridge operators was on hand to raise the bridge when the first warning came, and the second operator had just arrived at the time of the second warning, the situation may well have been one in which "defendant did not in fact have a chance of avoiding injury to a negligent plaintiff but would have had such chance had it not been for some prior negligence," Harper & James, supra, 1251–55. Many states do not apply the last clear chance rule in such cases. See also Prosser, supra, 290, 295; A. L. I. Restatement of Torts § 479, although there is famous authority for doing so. British Columbia Elec. Ry. v. Loach, [1916] 1 A. C. 719 (P.C.1915).

However the case would stand at common law, the last clear chance doctrine, not very satisfactory at best, has been utilized in admiralty quite selectively, to free a claimant from the consequences of a rather low degree of negligence in creating a dangerous situation of which the party whose activity led to the damage was well aware and which he could easily have overcome. See Gilmore & Black, supra, 404 & fn. 47. It would be a far cry from that to impose on the City sole liability to the ship and the wharfinger whose negligence resulted in the crash with the bridge and to exempt the ship and the wharfinger from all liability for demolishing the City's property. In a ship-bridge collision somewhat the converse of this, where the ship, if provided with a lookout, would have had the last clear chance, we direct-

ed division of damages, Circle Line Sightseeing Yachts, Inc. v. City of New York, 283 F.2d 811 (2 Cir. 1960), cert. denied, 365 U.S. 879, 81 S.Ct. 1030, 6 L. Ed.2d 191 (1961); the same course should be followed here.

III. *The allegedly unexpectable character of the events leading to much of the damage.*

The very statement of the case suggests the need for considering Palsgraf v. Long Island RR., 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253 (1928), and the closely related problem of liability for unforeseeable consequences.

In Sinram v. Pennsylvania R.R., 61 F. 2d 767, 770 (2 Cir. 1932), which received Palsgraf into the admiralty, Judge Learned Hand characterized the issue in that case as "whether, if A. omitted to perform a positive duty to B., C., who had been damaged in consequence, might invoke the breach, though otherwise A. owed him no duty; in short, whether A. was chargeable for the results to others of his breach of duty to B." Thus stated, the query rather answers itself; Hohfeld's analysis tells us that once it is concluded that A. had no duty to C., it is simply a correlative that C. has no right against A. The important question is what was the basis for Chief Judge Cardozo's conclusion that the Long Island Railroad owed no "duty" to Mrs. Palsgraf under the circumstances.

Certainly there is no general principle that a railroad owes no duty to persons on station platforms not in immediate proximity to the tracks, as would have been quickly demonstrated if Mrs. Palsgraf had been injured by the fall of improperly loaded objects from a passing train. Cf. the decision with respect to the husband in Carey v. Pure Distributing Corp., 133 Tex. 31, 124 S.W.2d 847 (1939). Neither is there any principle that railroad guards who jostle a package-carrying passenger owe a duty only to him; if the package had contained bottles, the Long Island would surely have been liable for injury caused to close bystanders by flying glass or spurting liquid. The reason why the Long Island was thought to owe no duty to Mrs. Palsgraf was the lack of any notice that the package contained a substance demanding the exercise of any care toward anyone so far away; Mrs. Palsgraf was not considered to be within the area of apparent hazard created by whatever lack of care the guard had displayed to the anonymous carrier of the unknown fireworks.[5] The key sentences in Chief Judge Cardozo's opinion are these:

"Here, by concession, there was nothing in the situation to suggest to the most cautious mind that the parcel wrapped in newspaper would spread wreckage through the station. If the guard had thrown it down knowingly and willfully, he would not have threatened the plaintiff's safety, so far as appearances could warn him. Liability can be no greater where the act is inadvertent." 248 N.Y. at 345, 162 N.E. at 101.

We see little similarity between the Palsgraf case and the situation before us. The point of Palsgraf was that the appearance of the newspaper-wrapped package gave no notice that its dislodgement could do any harm save to

5. There was exceedingly little evidence of negligence of any sort. The only lack of care suggested by the majority in the Appellate Division was that instead of endeavoring to assist the passenger, the guards "might better have discouraged and warned him not to board the moving train." 222 App.Div. 166, 167, 225 N.Y.S. 412, 413 (2d Dept. 1927). Chief Judge Cardozo said: "The man was not injured in his person nor even put in danger. The purpose of the act, as well as its effect, was to make his person safe.

If there was a wrong to him at all, which may very well be doubted, it was a wrong to a property interest only, the safety of his package." 248 N.Y. at 343, 162 N.E. at 100. Judge Andrews' dissent said the Long Island had been negligent, 248 N.Y. at 347, 162 N.E. 99, but did not state in what respect.

How much ink would have been saved over the years if the Court of Appeals had reversed Mrs. Palsgraf's judgment on the basis that there was no evidence of negligence at all!

itself and those nearby, and this by impact, perhaps with consequent breakage, and not by explosion. In contrast, a ship insecurely moored in a fast flowing river is a known danger not only to herself but to the owners of all other ships and structures down-river, and to persons upon them. No one would dream of saying that a shipowner who "knowingly and wilfully" failed to secure his ship at a pier on such a river "would not have threatened" persons and owners of property downstream in some manner.[6] The shipowner and the wharfinger in this case having thus owed a duty of care to all within the reach of the ship's known destructive power, the impossibility of advance identification of the particular person who would be hurt is without legal consequence. Jackson v. B. Lowenstein & Bros., 175 Tenn. 535, 136 S.W.2d 495 (1940); Pfeifer v. Standard Gateway Theater, 262 Wis. 229, 55 N.W.2d 29 (1952). Similarly the foreseeable consequences of the City's failure to raise the bridge were not limited to the Shiras and the Tewksbury. Collision plainly created a danger that the bridge towers might fall onto adjoining property, and the crash of two uncontrolled lake vessels, one 425 feet and the other 525 feet long, into a bridge over a swift ice-ridden stream, with a channel only 177 feet wide, could well result in a partial damming that would flood property upstream. As to the City also, it is useful to consider, by way of contrast, Chief Judge Cardozo's statement that the Long Island would not have been liable to Mrs. Palsgraf had the guard wilfully thrown the package down. If the City had deliberately kept the bridge closed in the face of the onrushing vessels, taking the risk that they might not come so far, no one would give house-room to a claim that it "owed no duty" to those who later suffered from the flooding. Unlike Mrs. Palsgraf, they were within the area of hazard.

The case is quite different from this Court's ruling in Sinram, where a tug which had negligently rammed a barge was held free of liability for the loss of coal that the bargee subsequently allowed to be loaded into his barge without first having inspected her for damage. That case illustrates the principle, noted in Judge Hand's opinion, 61 F.2d at 771, "that there must be a terminus somewhere, short of eternity, at which the second party becomes responsible in lieu of the first," Prosser, Torts, 280—a principle now explicitly recognized in the Restatement 2d Torts, § 452(2) (Tent. Draft No. 9, April, 1963): "Where, by contract or otherwise, all responsibility for the protection of the other against the threatened harm is shifted to the third person, his intentional or negligent failure to act to prevent such harm is a superseding cause." See, applying this, Ford Motor Co. v. Wagoner, 183 Tenn. 392, 192 S.W.2d 840, 852, 164 A.L.R. 364 (1946); Stultz v. Benson Lumber Co., 6 Cal.2d 688, 59 P.2d 100 (1936).[7]

Since all the claimants here met the Palsgraf requirement of being persons to whom the actors owed a "duty of care," we are not obliged to reconsider whether that case furnishes as useful a standard for determining the boundaries of liability in admiralty for negligent conduct as was thought in Sinram, when Palsgraf was still in its infancy. But this does not dispose of the alternative argument that the manner in which several of the claimants were harmed, particularly by flood damage, was unforeseeable and that recovery for this may not be had—whether the argument is put in the forthright form that unforeseeable damages are not

6. The facts here do not oblige us to decide whether the Shiras and Continental could successfully invoke Palsgraf against claims of owners of shore-side property upstream from the Concrete Elevator or of non-riparian property other than the real and personal property which was sufficiently close to the bridge to have been damaged by the fall of the towers.

7. Compare Professor Beale's "come to rest" rule, The Proximate Consequences of an Act, 33 Harv.L.Rev. 633, 651 ff. (1920), and Professor Seavey's "termination of risk" principle, Principles of Torts, 56 Harv.L.Rev. 72, 93 (1942).

recoverable or is concealed under a formula of lack of "proximate cause." [8]

So far as concerns the City, the argument lacks factual support. Although the obvious risks from not raising the bridge were damage to itself and to the vessels, the danger of a fall of the bridge and of flooding would not have been unforeseeable under the circumstances to anyone who gave them thought. And the same can be said as to the failure of Kinsman's shipkeeper to ready the anchors after the danger had become apparent. The exhibits indicate that the width of the channel between the Concrete Elevator and the bridge is at most points less than two hundred fifty feet. If the Shiras caught up on a dock or vessel moored along the shore, the current might well swing her bow across the channel so as to block the ice floes, as indeed could easily have occurred at the Standard Elevator dock where the stern of the Shiras struck the Tewksbury's bow. At this point the channel scarcely exceeds two hundred feet, and this was further narrowed by the presence of the Druckenmiller moored on the opposite bank. Had the Tewksbury's mooring held, it is thus by no means unlikely that these three ships would have dammed the river. Nor was it unforeseeable that the drawbridge would not be raised since, apart from any other reason, there was no assurance of timely warning. What may have been less foreseeable was that the Shiras would get that far down the twisting river, but this is somewhat negated both by the known speed of the current when freshets developed and by the evidence that, on learning of the Shiras' departure, Continental's employees and those they informed foresaw precisely that.

Continental's position on the facts is stronger. It was indeed foreseeable that the improper construction and lack of inspection of the "deadman" might cause a ship to break loose and damage persons and property on or near the river—that was what made Continental's conduct negligent. With the aid of hindsight one can also say that a prudent man, carefully pondering the problem, would have realized that the danger of this would be greatest under such water conditions as developed during the night of January 21, 1959, and that if a vessel should break loose under those circumstances, events might transpire as they did. But such *post hoc* step by step analysis would render "foreseeable" almost anything that has in fact occurred; if the argument relied upon has legal validity, it ought not be circumvented by characterizing as foreseeable what almost no one would in fact have foreseen at the time.

 The effect of unforeseeability of damage upon liability for negligence has recently been considered by the Judicial Committee of the Privy Council, Overseas Tankship (U.K.) Ltd. v. Morts Dock & Engineering Co. (The Wagon Mound), [1961] 1 All E.R. 404. The Committee there disapproved the proposition, thought to be supported by Re Polemis and Furness, Withy & Co. Ltd., [1921] 3 K.B. 560 (C.A.), "that unforeseeability is irrelevant if damage is 'direct.'" We have no difficulty with the result of The Wagon Mound, in view of the finding, 1 All E.R. at 407, that the appellant had no reason to believe that the floating furnace oil would burn, see also the extended discussion in Miller SS. Co. v. Overseas Tankship (U.K.) Ltd., The Wagon Mound No. 2, [1963] 1 Lloyd's Law List Rep. 402 (Sup.Ct.N.S.W.). On that view the decision simply applies the principle which excludes liability where the injury sprang from a hazard different from that which was improperly risked, see fn. 9. Although some language in the judgment goes beyond this, we would find it difficult to understand why one who had failed to use the care required to protect others in the light of expectable forces should

---

8. It is worth underscoring that the *ratio decidendi* in Palsgraf was that the Long Island was not required to use *any* care with respect to the package vis-a-vis Mrs. Palsgraf; Chief Judge Cardozo did not reach the issue of "proximate cause" for which the case is often cited. 248 N.Y. at 346–347, 162 N.E. 99.

be exonerated when the very risks that rendered his conduct negligent produced other and more serious consequences to such persons than were fairly foreseeable when he fell short of what the law demanded. Foreseeability of danger is necessary to render conduct negligent; where as here the damage was caused by just those forces whose existence required the exercise of greater care than was taken—the current, the ice, and the physical mass of the Shiras, the incurring of consequences other and greater than foreseen does not make the conduct less culpable or provide a reasoned basis for insulation.[9] See Hart and Honoré Causation in the Law, 234–48 (1959). The oft encountered argument that failure to limit liability to foreseeable consequences may subject the defendant to a loss wholly out of proportion to his fault seems scarcely consistent with the universally accepted rule that the defendant takes the plaintiff as he finds him and will be responsible for the full extent of the injury even though a latent susceptibility of the plaintiff renders this far more serious than could reasonably have been anticipated. See Prosser, Torts, 260.

The weight of authority in this country rejects the limitation of damages to consequences foreseeable at the time of the negligent conduct when the consequences are "direct," and the damage, although other and greater than expectable, is of the same general sort that was risked. See the many cases cited in Prosser, Torts, 260–62, fns. 75–78, and 263–64, and the recent reaffirmation, Dellwo v. Pearson, 259 Minn. 452, 107 N.W.2d 859, 97 A.L.R.2d 866 (1961), of Mr. Justice Mitchell's statement in Christianson v. Chicago, St. P., M. & O. Ry., 67 Minn. 94, 96, 69 N.W. 640, 641 (1896), that the rule of Hadley v. Baxendale, 9 Exch. 341 (1854), has no place in negligence law. Other American courts, purporting to apply a test of foreseeability to damages, extend that concept to such unforeseen lengths as to raise serious doubt whether the concept is meaningful;[10] indeed, we

9. The contrasting situation is illustrated by the familiar instances of the running down of a pedestrian by a safely driven but carelessly loaded car, or of the explosion of unlabeled rat poison, inflammable but not known to be, placed near a coffee burner. Larrimore v. American Nat. Ins. Co., 184 Okl. 614, 89 P.2d 340 (1939). Exoneration of the defendant in such cases rests on the basis that a negligent actor is responsible only for harm the risk of which was increased by the *negligent aspect* of his conduct. See Keeton, Legal Cause in the Law of Torts, 1–10 (1963); Hart & Honoré, Causation in the Law, 157–58 (1959). Compare Berry v. Borough of Sugar Notch, 191 Pa. 345, 43 A. 240 (1899).

This principle supports the judgment for the defendant in the recent case of Doughty v. Turner Mfg. Co., [1964] 2 W.L.R. 240 (C.A.). The company maintained a bath of molten cyanide protected by an asbestos cover, reasonably believed to be incapable of causing an explosion if immersed. An employee inadvertently knocked the cover into the bath, but there was no damage from splashing. A minute or two later an explosion occurred as a result of chemical changes in the cover and the plaintiff, who was standing near the bath, was injured by the molten drops. The risk against which defendant *was* required to use care—splashing of the molten liquid from dropping the supposedly explosion proof cover—did not materialize, and the defendant was found not to have lacked proper care against the risk that did. As said by Lord Justice Diplock, [1964] 2 W.L.R. at 247, "The former risk was well known (that was foreseeable) at the time of the accident; but it did not happen. It was the second risk which happened and caused the plaintiff damage by burning." Moreover, if, as indicated in Lord Pearce's judgment, [1964] 2 W.L.R. at 244, the plaintiff was not within the area of potential splashing, the case parallels Palsgraf; Lord Justice Diplock's statement, [1964] 2 W.L.R. at 248, that defendants "would have been under no liability to the plaintiff if they had intentionally immersed the cover in the liquid" is reminiscent of Chief Judge Cardozo's quoted above.

10. An instance is In re Guardian Casualty Co., 253 App.Div. 360, 2 N.Y.S.2d 232 (1st Dept.), aff'd, 278 N.Y. 674, 16 N.E. 2d 397 (1938), where the majority gravely asserted that a foreseeable consequence of driving a taxicab too fast was that a collision with another car would project the cab against a building with

wonder whether the British courts are not finding it necessary to limit the language of The Wagon Mound as we have indicated.[11]

We see no reason why an actor engaging in conduct which entails a large risk of small damage and a small risk of other and greater damage, of the same general sort, from the same forces, and to the same class of persons, should be relieved of responsibility for the latter simply because the chance of its occurrence, if viewed alone, may not have been large enough to require the exercise of care. By hypothesis, the risk of the lesser harm was sufficient to render his disregard of it actionable; the existence of a less likely additional risk that the very forces against whose action he was required to guard would produce other and greater damage than could have been reasonably anticipated should inculpate him further rather than limit his liability. This does not mean that the careless actor will always be held for all damages for which the forces that he risked were a cause in fact. Somewhere a point will be reached when courts will agree that the link has become too tenuous—that what is claimed to be consequence is only fortuity. Thus, if the destruction of the Michigan Avenue Bridge had delayed the arrival of a doctor, with consequent loss of a patient's life, few judges would impose liability on any of the parties here, although the agreement in result might not be paralleled by similar unanimity in reasoning; perhaps in the long run one returns to Judge Andrews' statement in Palsgraf, 248 N.Y. at 354–355, 162 N.E. at 104 (dissenting opinion). "It is all a question of expediency, * * * of fair judgment, always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind." It would be pleasant if greater certainty were possible, see Prosser, Torts, 262, but the many efforts that have been made at defining the *locus* of the "uncertain and wavering line," 248 N.Y. at 354, 162 N.E. 99, are not very promising; what courts do in such cases makes better sense than what they, or others, say. Where the line will be drawn will vary from age to age; as society has

such force as to cause a portion of the building to collapse twenty minutes later, when the cab was being removed, and injure a spectator twenty feet away. Surely this is "straining the idea of foreseeability past the breaking point," Bohlen, Book Review, 47 Harv.L.Rev. 556, 557 (1934), at least if the matter be viewed as of the time of the negligent act, as the supposedly symmetrical test of The Wagon Mound demands, [1961] 1 All Eng.R. at 415. On the other hand, if the issue of foreseeability is viewed as of the moment of impact, see Seavey, Mr. Justice Cardozo and the Law of Torts, 52 Harv.L.Rev. 372, 385 (1939), the test loses functional significance since at that time the defendant is no longer able to amend his conduct so as to avert the consequences.

11. In a recent case, workmen who had adjourned for their tea-break on a November afternoon left paraffin lamps as warnings around a tent covering an open manhole. Two boys determined to explore the manhole, using a ladder lying nearby; after they had performed this successfully, one of the lamps fell or was kicked into the manhole, an explosion occurred, and a boy fell in and suffered burns, particularly from applying his fingers to the hot rungs of the ladder. The Court of Sessions affirmed a defendant's judgment in deference to The Wagon Mound. The House of Lords reversed, their lordships explaining that this was not different from "the type or kind of accident * * * or occurrence that could reasonably have been foreseen." They stated that "The fact that the features or developments of an accident may not reasonably have been foreseen does not mean that the accident itself was not foreseeable"; that "In order to establish a coherent chain of causation it is not necessary that the precise details leading up to the accident should have been reasonably foreseeable"; and that "to demand too great precision in the test of foreseeability would be unfair * * * since the facets of misadventure are innumerable." Hughes v. Lord Advocate, [1963] A.C. 837, 852, 855, 857, reversing 1961 S.C. 310. This comes very close to saying that where the damage was of the sort that was risked, foreseeability is not required.

come to rely increasingly on insurance and other methods of loss-sharing, the point may lie further off than a century ago. Here it is surely more equitable that the losses from the operators' negligent failure to raise the Michigan Avenue Bridge should be ratably borne by Buffalo's taxpayers than left with the innocent victims of the flooding; yet the mind is also repelled by a solution that would impose liability solely on the City and exonerate the persons whose negligent acts of commission and omission were the precipitating force of the collision with the bridge and its sequelae. We go only so far as to hold that where, as here, the damages resulted from the same physical forces whose existence required the exercise of greater care than was displayed and were of the same general sort that was expectable, unforeseeability of the exact developments and of the extent of the loss will not limit liability. Other fact situations can be dealt with when they arise.

■■■ We have considered whether we should alter the three-way division of damages, decreed by the judge in favor of claimants who were free from fault, so that the negligence of the City would be considered one efficient force and the combined negligence of Kinsman and Continental another, with a further division between the latter, subject to Kinsman's limitation of liability. See The Eugene F. Moran, 212 U.S. 466, 29 S.Ct. 339, 53 L.Ed. 600 (1909); The Norwich Victory, 77 F.Supp. 264 (E.D.Pa.1948), aff'd United States v. Dump Scows No. 116, No. 120 and No. 122, 175 F.2d 556 (3 Cir.), cert. denied, American Dredging Co. v. United States, 338 U.S. 871, 70 S.Ct. 147, 94 L.Ed. 534 (1949); Moran Towing & Transp. Co., Inc. v. Empresa Hondurena de Vapores, 194 F. 2d 629 (5 Cir.), cert. denied, 343 U.S. 978, 72 S.Ct. 1074, 96 L.Ed. 1370 (1952); Pennsylvania R. Co. v. The Beatrice, 275 F.2d 209 (2 Cir. 1960). But the point has not been argued and although the issue may be sufficiently comprehended by Continental's appeal from being cast in any liability to enable us to consider it

if we chose, contrast International Milling Co. v. Brown SS. Co., 264 F.2d 803 (2 Cir. 1959), we are reluctant to take the initiative in adding still another to the number of issues here decided, and the matter appears to have little practical importance if Kinsman's limitation stands.

■■■ A separate problem is how to deal, among the negligent parties, with that part of Kinsman's responsibility of which its limitation frees it. We think the fair solution is to divide that deficiency equally between Buffalo and Continental, rather than to hold Continental liable to Buffalo for the entire unsatisfied portion of Kinsman's share and vice versa. This comports with the spirit of the rule whereby damages owing to an innocent third party are apportioned equally among responsible tortfeasors if another, through limitation or insolvency, is incapable of responding for his share—even though neither Buffalo nor Continental can technically be a tortfeasor against itself. See The Alabama, 92 U.S. 695, 23 L.Ed. 763 (1876); The City of Hartford, 97 U.S. 323, 24 L.Ed. 930 (1877).

■■■ The decree is modified so that the City of Buffalo may recover two-thirds of the damages to its property from Continental and Kinsman subject to limitation by the latter but with Continental bearing only half of Kinsman's deficiency, that Continental may recover two-thirds of the damages to its property from the City and Kinsman subject to limitation by the latter but with the City bearing only half of Kinsman's deficiency, and that Kinsman, which made no claim against Continental, may recover half of the damages suffered by the Shiras at the bridge from the City of Buffalo, which may then obtain contribution of half that amount from Continental. Under the principle of marshaling, see United States v. Behrens, 230 F.2d 504 (2 Cir. 1956), cert. denied, 351 U.S. 919, 76 S.Ct. 709, 100 L.Ed. 1451 (1956), Moore-McCormack Lines v. Richardson, 295 F.2d 583, 96 A.L.R.2d 1085 (2 Cir. 1961), cert.

denied, 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed. 2d 526, 370 U.S. 937, 82 S.Ct. 1577, 8 L. Ed.2d 806 (1962), the limitation fund should first be applied ratably to 50% of those claims of innocent parties for which Kinsman and Continental, but not the City, share responsibility, to wit, those damages to the Tewksbury and the Druckenmiller which occurred prior to the Tewksbury's collision with the bridge. If anything remains of the limitation fund thereafter, the City and Continental should precede other claimants. As so modified, the decree is affirmed.

■ Parties other than the City, Kinsman and Continental may recover their costs on appeal. The City, successful on the last clear chance issue but unsuccessful on others, may recover half costs against Kinsman and Continental. Kinsman, unsuccessful in its endeavor to avoid all liability but successful in holding its limitation, may recover half costs against the City and Continental, the two parties that challenged its limitation. Costs awarded against Kinsman shall be payable by it personally and not out of the limitation fund; costs payable to it shall not form part of the fund.

It is so ordered.

MOORE, Circuit Judge (concurring and dissenting):

I do not hesitate to concur with Judge Friendly's well-reasoned and well-expressed opinion as to limitation of Kinsman's liability, the extent of the liability of the City of Buffalo, Continental and Kinsman for the damages suffered by the City, the Shiras, the Tewksbury, the Druckenmiller and the Farr and the division of damages.

I cannot agree, however, merely because "society has come to rely increasingly on insurance and other methods of loss-sharing" that the courts should, or have the power to, create a vast judicial insurance company which will adequately compensate all who have suffered damages. Equally disturbing is the suggestion that "[H]ere it is surely more equi-

table that the losses from the operators' negligent failure to raise the Michigan Avenue Bridge should be ratably borne by Buffalo's taxpayers than left with the innocent victims of the flooding." Under any such principle, negligence suits would become further simplified by requiring a claimant to establish only his own innocence and then offer, in addition to his financial statement, proof of the financial condition of the respective defendants. Judgment would be entered against the defendant which court or jury decided was best able to pay. Nor am I convinced that it should be the responsibility of the Buffalo taxpayers to reimburse the "innocent victims" in their community for damages sustained. In my opinion, before financial liability is imposed, there should be some showing of legal liability.

Unfortunate though it was for Buffalo to have had its fine vehicular bridge demolished in a most unexpected manner, I accept the finding of liability for normal consequences because the City had plenty of time to raise the bridge after notice was given. Bridges, however, serve two purposes. They permit vehicles to cross the river when they are down; they permit vessels to travel on the river when they are up. But no bridge builder or bridge operator would envision a bridge as a dam or as a dam potential.

By an extraordinary concatenation of even more extraordinary events, not unlike the humorous and almost-beyond-all-imagination sequences depicted by the famous cartoonist, Rube Goldberg, the Shiras with its companions which it picked up en route did combine with the bridge demolition to create a very effective dam across the Buffalo River. Without specification of the nature of the damages, claims in favor of some twenty persons and companies were allowed (Finding of Fact #33, Interlocutory Decree, par. 11) resulting from the various collisions and from "the damming of the river at the bridge, the backing up of the water and ice upstream, and the overflowing of the banks of the river and flooding of industrial installations along

the river banks." (Sup. Finding of Fact #26a.)

My dissent is limited to that portion of the opinion which approves the awarding of damages suffered as a result of the flooding of various properties upstream. I am not satisfied with reliance on hindsight or on the assumption that since flooding occurred, therefore, it must have been foreseeable. In fact, the majority hold that the danger "of flooding would not have been unforeseeable under the circumstances to anyone who gave them thought." But believing that "anyone" might be too broad, they resort to that most famous of all legal mythological characters, the reasonably "prudent man." Even he, however, "carefully pondering the problem," is not to be relied upon because they permit him to become prudent "[W]ith the aid of hindsight."

The majority, in effect, would remove from the law of negligence the concept of foreseeability because, as they say, "[T]he weight of authority in this country rejects the limitation of damages to consequences foreseeable at the time of the negligent conduct when the consequences are 'direct.' " Yet lingering thoughts of recognized legal principles create for them lingering doubts because they say: "This does not mean that the careless actor will always be held for all damages for which the forces that he risked were a cause in fact. Somewhere a point will be reached when courts will agree that the link has become too tenuous—that what is claimed to be consequence is only fortuity." The very example given, namely, the patient who dies because the doctor is delayed by the destruction of the bridge, certainly presents a direct consequence as a factual matter yet the majority opinion states that "few judges would impose liability on any of the parties here," under these circumstances.

In final analysis the answers to the questions when the link is "too tenuous" and when "consequence is only fortuity" are dependent solely on the particular point of view of the particular judge under the particular circumstances. In differing with my colleagues, I must be giving "unconscious recognition of the harshness of holding a man for what he could not conceivably have guarded against, because human foresight could not go so far." (L. Hand, C. J., in Sinram v. Pennsylvania R. Co., 61 F.2d 767, 770, 2 Cir., 1932.) If "foreseeability" be the test, I can foresee the likelihood that a vessel negligently allowed to break its moorings and to drift uncontrolled in a rapidly flowing river may well strike other ships, piers and bridges. Liability would also result on the "direct consequence" theory. However, to me the fortuitous circumstance of the vessels so arranging themselves as to create a dam is much "too tenuous."

The decisions bearing on the foreseeability question have been so completely collected in three English cases [1] that no repetition of the reasoning pro and con of this principle need be made here. To these cases may be added the many American cases cited in the majority opinion which to me push the doctrine of foreseeability to ridiculous lengths—ridiculous, I suppose, only to the judge whose "human foresight" is restricted to finite limits but not to the judge who can say: It happened; *ergo*, it must have been foreseeable. The line of demarcation will always be "uncertain and wavering," Palsgraf v. Long Island R.R., 248 N.Y. 339, 354, 162 N.E. 99, 59 A.L.R. 1253 (1928), but if, concededly, a line exists, there must be areas on each side. The flood claimants are much too far on the non-liability side of the line. As to them, I would not award any recovery even if the taxpayers of Buffalo are better able to bear the loss.

1. In re Polemis and Furness, Withy & Co., [1921] 3 K.B. 560 (C.A.); Overseas Tankship (U. K.), Ltd. v. Morts Dock & Engineering Co., Ltd. (The Wagon Mound), [1961] 1 All E. R. 404; Miller Steamship Company, Pty., Ltd. v. Overseas Tankship (U. K.) Ltd., [1963] 1 Lloyd's Law List Rep. 402 (Sup.Ct., New South Wales).